**PRATT CENTRAL PARK LIMITED PARTNERSHIP, Plaintiff–Appellant,**

v.

**DAMES & MOORE, INC., Defendant–Appellee.**

Nos. 94–2761, 94–3663.

United States Court of Appeals, Seventh Circuit.

Argued March 28, 1995.

Decided July 19, 1995.

Laura A. Kaster (argued), William A. Von Hoene, Jr., Avidan J. Stern, Carey S. Rosemarin, Jenner & Block, Chicago, IL, for plaintiff-appellant.

Larry Selander (argued), Tracy D. Reckmeyer, Keck, Mahin & Cate, Chicago, IL, for defendant-appellee.

Before FLAUM, EASTERBROOK and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Dames & Moore, an engineering firm, performed a series of environmental risk assessments for the Alter Group, Ltd., between 1988 and 1990. Early in 1989 D & M evaluated the premises of Lind Plastic Products; it reported some asbestos but no underground contamination. Alter Group formed Pratt Central Park Limited Partnership to purchase the property. Later it came to light that the Lind property has two underground storage tanks containing hazardous chemicals. Alter (as we call both Alter Group and the partnership) has incurred cleanup expenses that it pegs at $90,000; the property has also declined in value because of the risk that further expenditures will prove necessary. Alter filed this suit under the diversity jurisdiction seeking compensation for breach of contract, including D & M's warranty of competent performance. The district court dismissed the suit for want of jurisdiction, see Fed.R.Civ.P. 12(b)(1), (h)(3), ruling that a $5,000 limit of liability in the Alter–D & M contract keeps the stakes below the $50,000 jurisdictional minimum. 1994 U.S.Dist. LEXIS 8632. Alter protests that whether it assented to a $5,000 cap is debatable, and that controversy protects federal jurisdiction under *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S.Ct. 586, 590–91, 82 L.Ed. 845 (1938): "It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal."

■ This famous passage is a remark rather than a holding. The issue before the Court was whether events after removal from state to federal court—in particular, amendment of the complaint to reduce the amount demanded—divest a district court of jurisdiction. The Court answered "no." See also *In re Shell Oil Co.*, 966 F.2d 1130, after remand, 970 F.2d 355 (7th Cir.1992). Later cases converted the observation to a holding, see *Bell v. Preferred Life Assurance Society*, 320 U.S. 238, 64 S.Ct. 5, 88 L.Ed. 15 (1943), which serves as a logical counterpart to the conclusion of *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), that the failure of a claim on the merits does not divest the federal court of jurisdiction. *Bell v. Hood* held that if a claim purportedly based on federal law is not frivolous, then the court has jurisdiction even if the plaintiff ultimately loses. See also *Crowley Cutlery Co. v. United States*, 849 F.2d 273 (7th Cir.1988). Similarly, if a complaint sets out a dispute substantial enough to come within the diversity jurisdiction, the plaintiff's inability to prove an injury exceeding the minimum amount in controversy does not affect jurisdiction. *Mt. Healthy City School District Board of Education*, 429 U.S. 274, 277, 97 S.Ct. 568, 571, 50 L.Ed.2d 471 (1977); *Rosado v. Wyman*, 397 U.S. 397, 405 n. 6, 90 S.Ct. 1207, 1214 n. 6, 25 L.Ed.2d 442 (1970); *Pace Communications, Inc. v. Moonlight Design, Inc.*, 31 F.3d 587, 591–92 (7th Cir.1994). The penalty for recovering less than $50,000 is the denial of costs, see 28 U.S.C. § 1332(b), not the loss of the whole judgment.

Requiring the plaintiff to prevail on the merits (or to recover more than $50,000) as a condition of federal jurisdiction would create two kinds of undesirable costs. First there would be a heightened cost of jurisdictional inquiry at the outset of the case. A judge would need to conduct proceedings, potentially complex, to determine whether the claim had sufficient substance to meet the jurisdictional requirements. In federal-question cases this inquiry would be a doppelgänger of the inquiry on the merits. In diversity cases this inquiry would probe the gravity of the

plaintiff's injury, calling for fact-finding proceedings that would presage the work of the jury. Yet the only purpose of making the inquiry would be to determine which court hears the case, a decision that ought to be taken swiftly. See *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 696–97, 105 S.Ct. 2297, 2307, 85 L.Ed.2d 692 (1985); *In re Continental Casualty Co.,* 29 F.3d 292 (7th Cir.1994). To make the "which court" decision expeditiously and cheaply, a judge must simplify the inquiry, and, as both *St. Paul* and *Bell v. Hood* observe, the judge must give the plaintiff the benefit of the doubt. The second kind of cost falls on the parties. If a judge dismisses a case for want of jurisdiction well into the litigation, the parties repair to state court—where they must bear the expense of litigation a second time, imposing unnecessary costs on the state tribunal in the process. By contrast, a conclusive decision on the merits, even if in the defendant's favor (or in the plaintiff's for less than $50,000), ends the controversy, promoting both public and private interests in achieving peace.

All that said, however, it does not follow that the court must accept the plaintiff's perspective and proceed to adjudicate on the merits every case in which the lawyers can keep straight faces when making their presentations. Such a latitudinarian approach creates other costs—particularly the evasion of jurisdictional lines drawn by Congress. *Ross v. Inter–Ocean Insurance Co.,* 693 F.2d 659, 661 (7th Cir.1982). Policing the border of federal jurisdiction is a necessity in any system having both limited (national) and general (state) courts. Set the barriers to federal adjudication too low, and the distinction collapses—for lawyers have a remarkable ability to propose improbable contentions with poker faces. The size of the federal bench, and the resources made available for adjudication, depend on assumptions about the ease of entry. To adjudicate a case fully just because the plaintiff has something of an argument may be the cheapest way to dispose of the current dispute, but it has costs for other litigants, who must wait in a longer queue, and the greater ease of access to the federal forum will attract new claimants for the limited time and resources of the federal bench. So there is necessarily a conflict between ready access to a federal court (the better to reduce costs in the immediate case) and rigorously enforcing the jurisdictional limits in marginal cases (the better to protect the interests of litigants whose claims are squarely within federal jurisdiction).

Conflicts of this sort between individual and systemic interests rarely yield to bright-line tests. Consider the "legal certainty" language of *St. Paul* itself. Does this mean "certain" knowing only what the plaintiff chooses to reveal in the complaint? Or does it mean "certain" after the judge has invested the energy needed to learn about the facts and the law? Many a case starts out looking uncertain to the judge, but as time passes and knowledge grows the outcome looks more and more inevitable. When does the "legal certainty" test apply? Surely not solely to the state of ignorance that prevails at the moment of filing; the judge must be allowed some time for legal research and factual inquiry. The plaintiff bears the burden of satisfying the judge's curiosity. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). As soon as we begin to ask how much time may be invested the quandary is upon us: that investment will be wasted if the case is dismissed and the parties return to state court, but unless some effort to dispel the original state of ignorance is allowed, the limits on federal jurisdiction are unenforceable.

Today's case illustrates the conflict. Alter insists that D & M's liability is unlimited by contract, and in the alternative that the contractual limit is $100,000. D & M says that the maximum is $5,000, shown in a clause of its Form C contract that was sent to one of Alter's representatives. Alter replies that the parties actually used Form B, with a $100,000 limit, and that there was no written contract for the Lind work, implying no limit. All questions of jurisdiction to one side, this dispute would set the stage for cross-motions for partial summary judgment. The judge may be able to resolve the dispute without trial, and resolution in favor of the $5,000 limit would drive a stake through the heart of the litigation (legal costs would make con-

tinuation prohibitive). The jurisdictional overtones add two things: the court gains under Rule 12(b)(1) some factfinding power that it lacks under Rule 56, see *Crawford v. United States,* 796 F.2d 924, 928–29 (7th Cir.1986), and a decision cast in jurisdictional terms does not foreclose renewal of the controversy in state court.

Several cases hold or imply that a court has the *power* to dismiss for want of jurisdiction after deciding that a limitation-of-liability clause (or a state statute) caps damages at less than the jurisdictional amount. *Valhal Corp. v. Sullivan Associates, Inc.,* 44 F.3d 195, rehearing en banc denied, 48 F.3d 760 (3d Cir.1995); *Sanchez–Arroyo v. Eastern Airlines, Inc.,* 835 F.2d 407 (1st Cir.1987); *Pachinger v. MGM Grand Hotel Las Vegas, Inc.,* 802 F.2d 362 (9th Cir.1986) (disagreeing with *Zacharia v. Harbor Island Spa, Inc.,* 684 F.2d 199 (2d Cir.1982)); *Morris v. Hotel Riviera, Inc.,* 704 F.2d 1113 (9th Cir.1983); *Sellers v. O'Connell,* 701 F.2d 575 (6th Cir. 1983); *Kalpakian v. Oklahoma Sheraton Corp.,* 398 F.2d 243 (10th Cir.1968). See also 14A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3702 at 48–49 (2d ed. 1985). We agree with this principle, implicit in our decision in *Ross,* which dismissed a case for want of jurisdiction even after the district judge had ruled on motions for summary judgment. *Ross* examined a contract, found no basis there for the plaintiff's claim to an essential element of damages, and held that jurisdiction was lacking. Sometimes a clause is so clear, or the legal means of undermining it so weak, that the plaintiff's demand is bound to come under the cap, and *St. Paul* would be satisfied at the inception of the case. See also *Nelson v. Keefer,* 451 F.2d 289 (3d Cir.1971); *Burns v. Anderson,* 502 F.2d 970 (5th Cir.1974); *Sanders v. Hiser,* 479 F.2d 71 (8th Cir.1973). That leaves the question of timing: if it becomes clear some time into the litigation that the restriction has teeth, should the judge limit damages via partial summary judgment or dismiss the suit for want of jurisdiction? Here certainty fails, and the judge must exercise the informed discretion for which the masters of the craft are so valued.

Alter protests that this cannot be so, because to decide whether the parties' contract contains the damages-limiting clause is to decide a (potentially) disputed issue of material fact, and thus to usurp the role of the jury in violation of the seventh amendment. Yet many contract cases can be and are decided on the papers; the parties agree what has happened and dispute only the legal significance of these facts. For the most part, that describes Alter's claim (we address the factual disputes later). Judges are entitled to decide such issues without the aid of juries. *Malak v. Associated Physicians, Inc.,* 784 F.2d 277, 280 (7th Cir.1986). Even when a jury would be required to make a decision on the merits, it is unnecessary to summon a jury to determine whether the court possesses jurisdiction: for example, the judge may take evidence and resolve conflicts to decide the citizenship of the parties. A judge equally may hear testimony and resolve conflicts to decide whether the parties' contract contains a particular clause limiting damages, when the only consequence is to move the case to another court. Allocation of issues between judge and jury is a question of federal law and not, as Alter supposes, of state law. *Mayer v. Gary Partners & Co.,* 29 F.3d 330 (7th Cir.1994); *AM International, Inc. v. Graphic Management Associates, Inc.,* 44 F.3d 572, 576–77 (7th Cir.1995). Alter is free to refile in state court and to argue there that D & M's damages are unlimited or that the cap is $100,000. *Bunker Ramo Corp. v. United Business Forms, Inc.,* 713 F.2d 1272, 1277 (7th Cir.1983); *Harper Plastics, Inc. v. Amoco Chemicals Corp.,* 657 F.2d 939, 943 (7th Cir.1981); cf. *Reinke v. Boden,* 45 F.3d 166 (7th Cir.1995) (similar principle, under Illinois law, when first dismissal is based on another state's statute of limitations). This makes us wonder why D & M is so keen to expel the case from federal court, and why Alter has lavished such expense on the appeal—for if the district court has jurisdiction Alter is well on the way to a judgment for $5,000—but our curiosity is of no moment. It is enough to say that the district judge possesses the power to eject a case when a contract holds damages below the jurisdictional amount.

Did the district judge use that power properly? When the question is one of prudence, deciding whether to act under Rule 12(b)(1) requires the judge to consider these costs (for both the parties and the two judicial systems). The stronger the defendant's case, the lower the costs of making the decision, the more free the judge should be to act under Rule 12(b)(1). The more distinct the damages from the merits, the more readily the district court should determine matters under Rule 12(b)(1). And because from this perspective the decision whether to act under Rule 12(b)(1) or Rule 56 is itself highly fact-specific, appellate review is deferential. See *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 399–405, 110 S.Ct. 2447, 2457–61, 110 L.Ed.2d 359 (1990) (identification of a "frivolous" argument is fact-specific, making review deferential); *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 932–37 (7th Cir.1989) (en banc) (same). Whether a claim falls beneath the jurisdictional minimum "to a legal certainty" is a cousin to the question whether a particular argument is "frivolous," implying similarly deferential appellate review. So too with the question how late in the litigation it is prudent to go before switching from analysis under Rule 12(b)(1) to analysis of "the merits." What is more, both the question "what was the parties' contract?" and the question "what is the optimal way to resolve the former question?" are contextual, leading us to accept well-reasoned decisions of the district courts without attempting to solve the riddles for ourselves. Cf. *Wilton v. Seven Falls Co.*, —— U.S. ——, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).

The district court did not abuse its discretion. The case focused from the outset on the jurisdictional amount, which is logically distinct from the questions whether D & M breached its duty of competent inspection and how much injury any errors caused. We concluded in *Pace Communications* that when the district judge hears the entire case, and enters a judgment exceeding $50,000, it is inappropriate to ditch the suit on appeal for want of the jurisdictional minimum. Alter relies on *Pace*, but that situation is a far cry from the events here, where the district court granted the Rule 12(b)(1) motion be-

fore getting into the merits. Too, the district court was able to resolve the jurisdictional question without the need for an evidentiary hearing. Alter believes that its argument for damages exceeding $50,000, is more substantial than the district judge let on, but given deferential review it is enough to say that the district judge reached a sound conclusion.

D & M performed 14 inspections for Alter between April 1988 and February 1990. The first four times, the parties signed D & M's Form B contract, which sets a limit of $100,000 in liability. The fifth job was under Form D, with a $5,000 limit. The sixth and seventh were performed without the benefit of any separate signed contract. After the seventh job was under way, Donald J. Sodersten sent Alter a copy of D & M's Form C, which like Form D provides a $5,000 limit. Sodersten informed Alter that Form C, captioned "General Conditions", contains D & M's fall-back terms. The letter stated: "All Dames & Moore projects are performed under our General Conditions and standard Schedule of Charges." Of course the parties may agree on other terms, as they had in the past, and as Form C itself invited. Section 3 of Form C provides for separate negotiation of limits of liability, and § 3.1 adds: "Client authorization to proceed without execution of this section indicates acceptance of standard terms and conditions described above in 2.0." Section 2.3 contains the $5,000 presumptive limit, and § 2.5 reads: "Increased liability limits may be negotiated upon client's written request, prior to commencement of services, and agreement to pay an additional fee." Before D & M takes a job, the client has superior information about the environmental risks at a site. Unlimited liability would not make commercial sense when one side holds all the pertinent information at the time of the negotiation; that is the principle behind *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep. 145 (1854), and the genesis of liability limitations in contracts of common carriers. See also *Rardin v. T & D Machine Handling, Inc.*, 890 F.2d 24, 26–27 (7th Cir. 1989); *Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 955–56 (7th Cir.1982). So D & M offered $5,000 as part of its standard terms, and higher limits for higher prices. Alter

had been willing to pay higher prices in the past, and Sodersten's letter, the district court concluded, made the arrangement clear to Alter.

Lind was the eighth job, hard on the heels of the Sodersten letter. Alter did not enter into separate negotiations for a limit exceeding $5,000. But within a month, for the tenth job, Alter had insisted on a higher limit and signed a D & M Form B with a $100,000 cap. Job 11 was performed with a signed contract containing a $5,000 cap. Alter and D & M opened negotiations for a general contract to cover all future work. Alter demanded a $100,000 limit but was unwilling to pay D & M's asking price for that exposure. Three jobs were performed in the fall of 1989 and winter of 1990 under Form D contracts with $5,000 limits. When Alter asked for D & M's bid on a job in June 1990 the parties were unable to agree on liability limits, and Alter switched engineering firms. That is the capsule history of the parties' dealings. Some jobs had explicit $5,000 limits, some had explicit $100,000 limits, and three were not accompanied by signed contracts. The district court thought that the standby terms governed the two jobs following Alter's receipt of the Sodersten letter.

Alter has two principal replies. One is that the variety of signed contracts shows that Form C and its $5,000 limit cannot have represented the parties' bargain. Not at all. Because Form C invited negotiations and offered other limits of liability, the fact that the parties sometimes reached different deals cannot be seen to reject Form C as the fount of terms that apply in the absence of other agreement. Alter's other principal argument is that neither Sodersten nor Stephen Park, who was acting for Alter, "intended" to change the terms under which the parties had been dealing. Park testified at his deposition that he disapproved of Form C and signified this disapproval by—doing and saying nothing! Alter got Sodersten to concede at a deposition that he had not ascertained the terms of prior Alter–D & M jobs and had not set out to change them by sending Form C to Park. Well and good, but so what? Sodersten *did* propose Form C, and Park *did not* protest. He soon hired D & M to do

another job, without requesting other terms or communicating any displeasure with Form C. Judges often speak of contracts as expressing the "intent" of the parties and even employ the metaphor of the "meeting of the minds." That metaphor cannot be taken literally, see *Colfax Envelope Corp. v. Graphic Communications Union*, 20 F.3d 750 (7th Cir.1994); *Johnson Controls, Inc. v. Plumbers Union*, 39 F.3d 821 (7th Cir.1994), and the reference to "intent" does not invite the court to tour the parties' minds. *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810 (7th Cir.1987). "Intent" is a shorthand for the congeries of signs and symbols that the parties exchange. The theory of contract is in the end objective. See *Bristow v. Drake Street Inc.*, 41 F.3d 345 (7th Cir.1994) (Illinois law); *AM International*, 44 F.3d at 575–76 (same); *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill.2d 306, 313–14, 113 Ill.Dec. 252, 256, 515 N.E.2d 61, 65 (1987); *Steinberg v. Chicago Medical School*, 69 Ill.2d 320, 331, 13 Ill.Dec. 699, 705, 371 N.E.2d 634, 640 (1977). We know what transpired between the parties; the mental states of Park and Sodersten are legally irrelevant. D & M made a concrete proposal, laying out the terms on which it did business unless the parties provided otherwise. Sometimes the parties *did* provide otherwise, but for the Lind job they did not. Alter rather than D & M thus bore the risk of loss over $5,000.

Or so the district court could conclude without exceeding the bounds allowed by Rule 12(b)(1). As we have said, it is not our aim to tie the hands of the Illinois courts on this subject should Alter refile in the right forum. Like the district court, however, we believe that the signs and portents are sufficiently poor that recovery exceeding $5,000 is unlikely, and that 28 U.S.C. § 1332(a) therefore allocates this dispute to state rather than federal court.

AFFIRMED.

FLAUM, Circuit Judge, dissenting.

I disagree with the majority's reasoning on two distinct grounds. First, I believe that the October 10 contract, under which Alter supposedly agreed to a $5,000 limitation of

liability when it requested Dames & Moore to perform the Lind assessment on November 30, is irrelevant to an analysis of our jurisdiction over the case. In my opinion, the complaint as pleaded put over $50,000 into controversy, and Dames & Moore only raised an affirmative defense that would limit that recovery. The validity of an affirmative defense, however, cannot affect our diversity jurisdiction. Second, even if the October 10 contract should come into play, I do not think that it limits Pratt's possible recovery to a legal certainty such that this case can be dismissed for want of subject matter jurisdiction.

## I.

As the majority notes, the Supreme Court has stated that for a court to dismiss a diversity case for failure to satisfy the amount-in-controversy requirement, "[i]t must appear to a legal certainty that the claim is for less than the jurisdictional amount...." *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938). It is also true that the court's inquiry into jurisdiction is not limited to the face of the complaint. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Roman v. United States Postal Service,* 821 F.2d 382, 385 (7th Cir.1987); *Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir.1979); *see also Holt v. United States,* 46 F.3d 1000, 1002–03 (10th Cir.1995). The mere allegation of jurisdictional facts does not guarantee a litigant her day in court if the district court determines that those facts do not exist.

However, that same line of cases also requires that any inquiry into the jurisdictional amount cease at the boundaries of the complaint. A possible defense, however good and likely to be pleaded in response to the complaint, does not matter. *Smithers v. Smith,* 204 U.S. 632, 642, 27 S.Ct. 297, 299, 51 L.Ed. 656 (1907); *Schunk v. Moline, Milburn & Stoddard Co.,* 147 U.S. 500, 505, 13 S.Ct. 416, 417, 37 L.Ed. 255 (1893); 14A Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 3702 at 33–35 (West, 2d ed.

1985); *see also St. Paul Mercury,* 303 U.S. at 289, 58 S.Ct. at 590 ("The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction. Nor does the fact that the complaint discloses the existence of a valid defense to the claim.") Thus,

[a]lthough there might be a perfect defense to the suit ..., yet the fact of a defense, and a good defense, too, would not affect the question as to what was the amount in dispute.... In short, the fact of a valid defense to a cause of action, although apparent on the face of the petition, does not diminish the amount that is claimed, nor determine what is the matter in dispute....

*Schunk,* 147 U.S. at 504–05, 13 S.Ct. at 417; *see also Smith,* 204 U.S. at 642–43, 27 S.Ct. at 300; *Tongkook America, Inc. v. Shipton Sportswear Co.,* 14 F.3d 781, 784 (2d Cir. 1994); *Ochoa v. Interbrew America, Inc.,* 999 F.2d 626, 628–29 (2d Cir.1993); *Jihaad v. O'Brien,* 645 F.2d 556, 561 (6th Cir.1981); *Worthams v. Atlanta Life Ins. Co.,* 533 F.2d 994, 997–98 (6th Cir.1976); *James v. Lusby,* 499 F.2d 488, 492 (D.C.Cir.1974); *Riggins v. Riggins,* 415 F.2d 1259, 1262 (9th Cir.1969); *Anderson v. Moorer,* 372 F.2d 747, 750 (5th Cir.1967); *Burks v. Texas Co.,* 211 F.2d 443, 445 (5th Cir.1954); *Guy v. Duff and Phelps, Inc.,* 625 F.Supp. 1380, 1382 (N.D.Ill.1985); *Lichter v. Paine, Webber, Jackson & Curtis, Inc.,* 570 F.Supp. 533, 536 (N.D.Ill.1983); *Larsen v. Hoffman,* 444 F.Supp. 245, 253–54 (D.D.C.1977). Courts may analyze additional factual and legal proofs to explain the complaint's allegations as per *McNutt,* but they may not investigate further. *See Zacharia v. Harbor Island Spa, Inc.,* 684 F.2d 199, 202 (2d Cir.1982).

The logic of the defense rule, as it might be called, is understandable; it follows from the general proposition that courts should only decide the controversies placed before them. The rule operates as a companion to that of *Louisville & Nashville Ry. Co. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908): just as a defense cannot create federal jurisdiction in a complaint that does not otherwise state a federal claim, so a defense cannot defeat it in a complaint that

does. The rule also comports with *St. Paul Mercury*'s holding that a plaintiff cannot divest a federal court of jurisdiction by lowering its damages request below the jurisdictional minimum after a case has been properly removed into federal court, as well as with the dictate that a plaintiff's ultimate failure to recover the jurisdictional minimum does not itself deprive a court of jurisdiction. *See Mt. Healthy City School Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274, 276–77, 97 S.Ct. 568, 571, 50 L.Ed.2d 471 (1977).

The question then becomes whether the defense rule applies to the instant case. Pratt filed a complaint alleging negligent misrepresentation and breach of contract. Putting aside the breach of contract claim, liability for negligent misrepresentation under Illinois law[1] exists "when one, in the course of his business, negligently supplies information to another who suffers harm in reliance on the information." *Perschall v. Raney,* 137 Ill.App.3d 978, 92 Ill.Dec. 431, 434, 484 N.E.2d 1286, 1289 (4th Dist.1985); *see also Greycas, Inc. v. Proud,* 826 F.2d 1560, 1565 (7th Cir.1987), *cert. denied,* 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 862 (1988); *Duhl v. Nash Realty, Inc.,* 102 Ill. App.3d 483, 57 Ill.Dec. 904, 912–13, 429 N.E.2d 1267, 1275–76 (1st Dist.1981); *Penrod v. Merrill Lynch, Pierce, Fenner & Smith,* 68 Ill.App.3d 75, 24 Ill.Dec. 464, 469, 385 N.E.2d 376, 381 (3d Dist.1979); 9 Stuart M. Speiser, Charles F. Krause, and Alfred W. Gans, THE AMERICAN LAW OF TORTS § 32:74 (Clark Boardman Callaghan, 1992). The facts as pleaded and supported certainly establish that Dames & Moore was in the business of providing information—environmental assessments. The facts as pleaded

and supported also indicate Pratt's reliance on this information and damages in excess of $50,000 resulting therefrom. That is enough to survive a motion to dismiss for lack of subject matter jurisdiction. The fact that another agreement between the parties may potentially, even conclusively limit these damages speaks to the wisdom of granting partial summary judgment on the damages issue. Such an agreement is, however, only an imperfect affirmative defense to a claim of negligent misrepresentation. *Cf. Mulliken v. Lewis,* 245 Ill.App.3d 512, 185 Ill.Dec. 730, 731–32, 615 N.E.2d 25, 26–27 (4th Dist.1993). Not surprisingly, Dames & Moore labeled the $5,000 limitation of liability its "First Affirmative Defense" in its answer to Pratt's complaint and in its appellate brief. That defense should have no bearing on our consideration of Dames & Moore's Rule 12(b)(1) motion.

The majority points to a number of cases to support its argument that a court has the power to dismiss for lack of jurisdiction after deciding that a limitation-of-liability clause applies in a given case. In my view, of the cases the majority cites—*Valhal Corp. v. Sullivan Associates, Inc.,* 44 F.3d 195, *reh'g en banc denied,* 48 F.3d 760 (3d Cir.1995); *Sanchez–Arroyo v. Eastern Airlines, Inc.,* 835 F.2d 407 (1st Cir.1987); *Pachinger v. MGM Grand Hotel Las Vegas, Inc.,* 802 F.2d 362 (9th Cir.1986); *Morris v. Hotel Riviera, Inc.,* 704 F.2d 1113 (9th Cir.1983); *Sellers v. O'Connell,* 701 F.2d 575 (6th Cir.1983); *Ross v. Inter–Ocean Ins. Co.,* 693 F.2d 659 (7th Cir.1982); *Kalpakian v. Oklahoma Sheraton Corp.,* 398 F.2d 243 (10th Cir.1968)—all are either wholly distinguishable or provide little succor for its position.[2]

---

1. Both parties agree that Illinois law would govern this case.

2. The majority also cites to a passage in Wright, Miller and Cooper discussing the application of the legal certainty doctrine to cases "when the terms of a contract limit the plaintiff's possible recovery" or "when a specific rule of law or measure of damages limits the amount of damages recoverable." 14A Wright, Miller, and Cooper, *Federal Practice* § 3702 at 49. The cases cited at that passage refer primarily to contract claims, in which the contract itself (typically an insurance contract) concerned less than the jurisdictional minimum, *see, e.g., Budget Rent–A–Car*

*Systems, Inc. v. Stauber,* 849 F.Supp. 743 (D.Hawaii 1994), to claims in which the law on which the plaintiff was suing itself permitted only a limited recovery, *see, e.g., Indiana Hi–Rail Corp. v. Decatur Junction Ry. Co.,* 37 F.3d 363 (7th Cir.1994), or to cases, often actions to collect debts, where the value of something sought was unquestionably below the jurisdictional minimum at the time the case was filed. *See, e.g., Odell v. Humble Oil & Refining Co.,* 201 F.2d 123 (10th Cir.1953), *cert. denied,* 345 U.S. 941, 73 S.Ct. 833, 97 L.Ed. 1367 (1953); *Maryland Nat'l Bank v. Nolan,* 666 F.Supp. 797 (D.Md.1987). None of these scenarios, in my opinion, tracks the instant suit.

First, *Sellers* and *Ross* concerned the validity of proof underlying a claim for punitive damages or attorney's fees.[3] I agree that where a plaintiff would have to recover punitive damages or attorney's fees in order to satisfy the amount in controversy and the plaintiff has no chance at either because of the law on which the claim is based, dismissal may be appropriate. *See also Sharp Electronics Corp. v. Copy Plus, Inc.*, 939 F.2d 513, 515 (7th Cir.1991). Punitive damages and attorney's fees are still fundamentally different from affirmative defenses. The validity of punitive damages and attorneys fees does not require an investigation beyond the bounds of the complaint, and as with ordinary damages, the plaintiff makes the choice to introduce them into the controversy.

*Valhal* does implicitly support the majority's position. In *Valhal*, the Valhal Corporation sought to purchase land in Philadelphia and requested Sullivan Associates to conduct a feasibility study of the project. Included in the contract was a provision limiting liability to $50,000. Valhal never signed the contract but did authorize Sullivan to proceed on the study. After Sullivan completed its study, Valhal purchased the land in question and then discovered that a building restriction would prevent it from continuing with its project. Valhal subsequently brought a diversity suit against Sullivan seeking $2 million in damages because of the failure to notify Valhal of the restriction, arguing claims in contract, negligent misrepresentation, and gross negligence. Sullivan, in turn, moved for partial summary judgment on the grounds that its liability was expressly limited to $50,000. The district court determined that the liability limitation was a part of the contract but that it was contrary to Pennsylvania public policy. *Valhal*, 44 F.3d at 199. The case proceeded to trial, at which a jury found against Valhal on the negligence counts but for Valhal on the contract claim and awarded it $1 million.

On appeal, the Third Circuit reversed. After a thorough analysis of Pennsylvania law, the court determined that the limitation of liability clause was a part of the contract to perform the feasibility study and that the clause did not violate any Pennsylvania public policy. The court then held that "[b]ecause we have concluded that the limitation of liability clause is an enforceable part of the contract which is the basis of this diversity action, Valhal's maximum possible recovery is $50,000. Therefore, the district court was without subject matter jurisdiction to hear this controversy." *Id.* at 209.

To the extent one accepts the argument that the *Valhal* limitation of liability clause was, to a legal certainty, a part of the contract, and the contract was "the basis of th[e] diversity action," the case is properly decided and fits comfortably within the defense rule. To the extent *Valhal*, which cites virtually no federal law—not even *St. Paul Mercury*—in support of its decision to dismiss for lack of subject matter jurisdiction, stands as an invitation to probe the validity of a legal defense in determining whether a plaintiff has met the amount in controversy requirement, I believe the case is incorrectly decided. The *Valhal* court focused almost entirely on whether and when Pennsylvania law permitted enforcement of limitation of liability clauses; all sides appeared to have agreed that a dismissal was warranted if that issue was reached and did not consider the matter further. In all likelihood, the court and the parties simply did not address the problem we confront in this case.[4]

---

3. *Sellers* also concerned two other tries at the jurisdictional minimum: an attempt to aggregate the claims of a class of plaintiffs to reach the jurisdictional amount, and a claim for liquidated damages which the plaintiff admitted had been fixed below the jurisdictional amount before the time the claim was filed but of which the plaintiff did not know at the time of filing only because of her ignorance. *Sellers*, 701 F.2d at 578–79. The *Sellers* court still agreed with the principle that "once jurisdiction attaches, subsequent events such as discovery proceedings or the application of legal defenses do not divest the court of jurisdiction." *Id.* at 579.

4. In a dissent from rehearing en banc, Judge Hutchinson argued that *Valhal* was incorrectly decided because of the uncertainty regarding the state of Pennsylvania law and the panel's improper application of the legal certainty standard. 48 F.3d at 762.

That leaves *Pachinger, Morris,* and *Kalpakian.*[5] These cases, all in the context of determining the liability of a hotel for goods entrusted to the hotel by a guest, do uphold dismissals that depended on statutory or contractual limitations of a defendant's liability, but their reasoning is less than satisfying. The *Pachinger* court reached its decision primarily on the basis of *Morris,* and *Morris* in turn relied primarily on *Kalpakian. Kalpakian,* like *Valhal,* mentions almost no federal law in justifying its outcome. Instead, the *Kalpakian* court determined that an Oklahoma liability statute would necessarily limit a guest's recovery from a hotel to no more than $1,500.[6] The court then asserted that the action did not belong in federal court, citing only one case for the proposition that such actions can be dismissed. *Kalpakian,* 398 F.2d at 247. That case, *City of Boulder v. Snyder,* 396 F.2d 853 (10th Cir.1968), *cert. denied,* 393 U.S. 1051, 89 S.Ct. 692, 21 L.Ed.2d 693 (1969), concerned a situation in which the plaintiff's own testimony limited her damages to well below the jurisdictional minimum, a situation well within the defense rule and, I believe, inapposite to the scenario in *Kalpakian* (or those in *Morris* and *Pachinger*).

In clear opposition to *Pachinger, Morris,* and *Kalpakian* stands *Zacharia v. Harbor Island Spa, Inc.,* 684 F.2d 199 (2d Cir.1982).[7] In *Zacharia,* the district court had dismissed a guest's claim against a hotel for items deposited in but stolen from one of the hotel's safe deposit boxes. *Zacharia,* 684 F.2d at 201–02. The guest filed a diversity suit against the hotel and alleged damages in excess of $10,000, the jurisdictional minimum at the time. The district court granted the

hotel partial summary judgment on the grounds that a limitation-of-liability policy signed in connection with the use of the safety deposit box, a policy found to comply with the state law regarding such limitations on liability, would cap the guest's recovery at $1,000. The district court then dismissed the matter for lack of subject matter jurisdiction. *Id.* at 202.

The Second Circuit reversed. The court noted that the district court had improperly gone beyond the allegations of the complaint in deciding its jurisdiction. The district court could "resort to materials developed in discovery to amplify the meaning of the complaint allegations," but it exceeded its authority when it considered a defense to the guest's claim: "Even if the Court's interpretation of Florida law were correct, dismissal contravenes the rule that the existence of a valid defense does not deprive a federal court of jurisdiction." *Id.* Noting the problems allowing jurisdictional challenges on bases other than the plaintiff's complaint would raise, the court held that "motions to dismiss for lack of a sufficient amount in controversy must be directed solely to the plaintiff's allegations." *Id.*

In my opinion, *Zacharia,* which the Second Circuit has continued to follow, *see Tongkook,* 14 F.3d at 785; *Ochoa,* 999 F.2d at 629, is clearly better reasoned than *Kalpakian* or its progeny. *Zacharia* is also far more in keeping with Supreme Court precedent on this issue, as well as precedent in most of the circuits. I thus believe the majority errs in choosing *Kalpakian* over *Zacharia.* Alternatively, one can reconcile the *Kalpakian*

---

5. It also leaves *Sanchez–Arroyo.* That case upholds a dismissal based on a limitation-of-liability clause but does so with essentially no reasoning, or citation for that matter. Like *Valhal,* if the suit was somehow based on the limitation-of-liability contract and the plaintiffs pled the existence of that contract, then perhaps the case was correctly decided; the case's brevity makes it difficult to know exactly what was at issue. In any event, *Sanchez–Arroyo* deals primarily with the waiver of arguments not raised in the district court and probably should not be relied on for more than that proposition. See 835 F.2d at 408–09.

6. Interestingly, *Kalpakian* cites a Seventh Circuit case, *Eichberg & Co., Inc. v. Van Orman Fort*

*Wayne Corp.,* 248 F.2d 758 (7th Cir.1957), *cert. denied,* 356 U.S. 927, 78 S.Ct. 716, 2 L.Ed.2d 759 (1958), in which we upheld a limitation of a hotel's liability to a guest under an Indiana law similar to the Oklahoma law at issue in *Kalpakian. Eichberg* was a diversity case, and we held on the merits that the hotel's liability was conclusively limited to $400. While the fact that we did not dismiss *Eichberg* for lack of jurisdiction is not dispositive, *Eichberg* certainly implies that such limitations do not divest a court of jurisdiction.

7. *Morris* did not cite *Zacharia. Pachinger* acknowledged *Zacharia* as opposing precedent but declined to follow it because of *Morris. Pachinger,* 802 F.2d at 364.

line of cases and the defense rule on the theory that those cases hold that a cause of action by a hotel guest against a hotel is based not on common law theories of negligence or strict liability but rather depends entirely on statutory schemes that expressly limit recovery against the hotel. That reconciliation, similar to the one suggested above for *Valhal,* would leave the majority with no real precedential support for its holding. Either way, the defense rule should still operate in the instant case to keep Pratt in federal court.

Finally, the defense rule notwithstanding, Pratt might still lose if it alleged too much in its complaint and thereby pleaded itself out of federal court. *See, e.g., Esmail v. Macrane,* 53 F.3d 176, 179 (7th Cir.1995); *Conn v. GATX Terminals Corp.,* 18 F.3d 417, 419 (7th Cir.1994); *Tregenza v. Great American Communications Co.,* 12 F.3d 717, 718 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994). Perhaps, one might argue, Pratt's decision to plead its version of the Lind contract is just such an example of overpleading. I do not think so. Pratt did not, and did not have to, plead the existence of the October 10 letter. Dames & Moore raised the letter in its response and bore the burden of arguing the existence of any contract arising from this letter. That strikes me as an affirmative defense to liability, and any dismissal based on that letter was therefore inappropriate.

## II.

Even if the October 10 letter and any agreement arising from it were properly considered on a motion to dismiss for lack of subject matter jurisdiction, I believe that Pratt has adequately responded to the "legal certainty" challenge placed before it. I also conclude that the majority's spirit of deference to the district court goes too far.

The issue of whether the October 10 agreement was valid depends upon Illinois law. Under Illinois law, "a signature is not always essential to the binding force of an agreement"; assent may be demonstrated by other acts or conduct of the parties. *Lynge v. Kunstmann,* 94 Ill.App.3d 689, 50 Ill.Dec. 146, 150, 418 N.E.2d 1140, 1144 (2d Dist.

1981); *see also Soelzer v. Soelzer,* 382 Ill. 393, 47 N.E.2d 458, 460 (1943); *Landmark Properties, Inc. v. Architects International–Chicago,* 172 Ill.App.3d 379, 122 Ill.Dec. 344, 347, 526 N.E.2d 603, 606 (1st Dist.1988); *Amelco Electronic Co. v. Arcole Midwest Corp.,* 40 Ill.App.3d 118, 351 N.E.2d 349, 354 (1st Dist. 1976); *Lundin v. Egyptian Construction Co., Inc.,* 29 Ill.App.3d 1060, 331 N.E.2d 208 (1st Dist.1975). However, where a party relies on a course of conduct as evidence of assent to an agreement, the conduct must clearly and unequivocally relate to that agreement. *Hermes v. William F. Meyer Co.,* 65 Ill. App.3d 745, 22 Ill.Dec. 451, 455–56, 382 N.E.2d 841, 845–46 (2d Dist.1978); *Landmark,* 122 Ill.Dec. at 347, 526 N.E.2d at 606 ("For the course of conduct to act as consent to a contract, it must be clear that the conduct relates to the specific contract in question."); *Lundin,* 331 N.E.2d at 211. Thus, in *Landmark,* the plaintiff was held to have assented to a contract form sent by the defendant even though the plaintiff had never signed the contract because the plaintiff had subsequently promised payments and requested mediation in accordance with the contract form. 122 Ill.Dec. at 347, 526 N.E.2d at 606. Similarly, in *Amelco,* the court determined that parties had assented to a written contract where the plaintiff had received the written contract and had performed pursuant to the terms in the contract but had ignored an initial and subsequent demand to sign the contract. 351 N.E.2d at 354. But in *Lundin,* one party sent a "confirming order" to the other after an oral agreement between the parties to perform a plumbing subcontract. The order was never signed or returned in spite of requests by the sender to do so. The recipient nonetheless continued to work on the contract after receiving the order. A dispute later arose between the parties regarding liability for an injured worker, liability the unsigned confirming order would have addressed. The court held that the post-order conduct did not, as a matter of law, confirm the order because the recipient may have well been performing solely pursuant to the original oral agreement and not the confirming order. The court noted that the recipient had specifically stated in an affidavit that it had com-

pleted the contract based on the oral agreement and not the confirming order. 331 N.E.2d at 211.

In the instant case, as the majority notes, Dames & Moore performed fourteen inspections for Alter between April, 1988 and February, 1990. The first four inspections were conducted under Dames & Moore's Form B contract, which provides a $100,000 limit of liability. The next inspection was conducted under a Form D, which contains a $5,000 limit. The next two inspections were conducted without any signed contract, although Dames & Moore asserts that they were covered by Form B. One week after arranging for the seventh inspection, on October 10, 1988, Donald Sodersten, an agent of Dames & Moore, sent the following letter to Stephen Parks at Alter:

Dear Mr. Parks:

Let me take this opportunity to thank you and Mr. Thomas for allowing Dames & Moore to provide the Alter Group with environmental assessment services for the Foster Electric site as well as other sites in Illinois. We view your continued use of Dames & Moore as a sign of confidence in our services. Be assured that we will continue to work hard to maintain that confidence. Although the field investigation for a particular site can normally be accomplished in one day, the research normally takes well over a week. I would therefore request that you provide us with as much time as possible to complete these assessments, so that we may provide you with the most detailed report possible.

All Dames & Moore projects are performed under our General Conditions and standard Schedule of Charges, copies of which are enclosed. I have reviewed our files and have found nothing that indicates that The Alter Group is cognizant of our General Conditions. Please review our General Conditions and sign one copy of the enclosed forms and return them to us, so that our files will be complete.

If I can be of any assistance, please do not hesitate to call me.

Attached to the letter was a copy of Dames & Moore's Form C, which provides for a standard $5,000 limitation of liability on its projects and stipulates in part that "Client authorization to proceed without execution of this section indicates acceptance of the standard terms and conditions." Alter did not respond to the letter or its accompanying forms. Seven weeks later, on November 30, Park called Sodersten to request the Lind environmental assessment, the alleged deficiency of which is the main subject of this litigation. The parties did not discuss any terms and conditions. Dames & Moore accepted the offer and performed the assessment.

The district court determined that Park's November 30 call requesting the Lind assessment court was an acceptance of the terms and conditions accompanying the October 10 letter. Certainly, this was a reasonable resolution of the dispute, and as the majority correctly notes, a district court may resolve disputed factual issues in the context of deciding a 12(b)(1) motion. Where the district court decides those factual issues, our review should be for clear error, see *McFarlane v. Life Ins. Co. of North America*, 999 F.2d 266, 267–68 (7th Cir.1993), although "the plaintiff is entitled to the benefit of any facts he could conceivably prove in support of his allegations." *Lichter*, 570 F.Supp. at 536.[8]

But we are not simply reviewing whether the district court made the best guess possible regarding Illinois law. That the inferences the district court drew regarding the October 10 letter were not clearly erroneous does not mean that it was settled "to a legal

---

8. Of course, the clear error standard should not extend to cases where the jurisdictional issue is intertwined with the merits of the claim. *See Williamson v. Tucker*, 645 F.2d 404, 416 n. 10 (5th Cir.1981), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). The reasons for that are clear: we do not want district courts to resolve the merits of a dispute under the guise of jurisdiction. In some situations, the merits and the jurisdictional issues are clearly separable; establishing diversity of citizenship will typically have little to do with the main elements of a claim. In other cases, the merits and the jurisdictional issues are clearly united; the existence of a cause of action under federal law. The latter, however, is not this case: the jurisdictional problem regarding Pratt's amount in controversy lies at the edges of the merits of its case.

certainty" that Pratt could not recover more than $5,000. *See Ochoa,* 999 F.2d at 630. Courts do not, as the majority notes, have to accept in the context of Rule 12(b)(1) every allegation that lawyers can make with "straight faces." Majority Op. at 351. But the inquiry should not go too much further;[9] the legal certainty test and the good faith test are essentially "linguistic variant[s]" of one another. *Ochoa,* 999 F.2d at 628–29. Moreover, however deferential we may be to the district court's findings of fact, we continue to evaluate decisions to dismiss for lack of subject matter jurisdiction *de novo. Joyce v. Joyce,* 975 F.2d 379, 382 (7th Cir.1992).

In my opinion the October 10 letter and the November 30 telephone call do not, to a legal certainty, unequivocally refer to each other. Far from being "hard on the heels of one another," Majority Op. at 355, they were seven weeks apart, and that long a time span is reflected in none of the Illinois cases cited above. That delay may demonstrate, as Pratt suggests, a rejection of the terms of the October 10 letter. The prior conduct between the parties indicates that they would have been willing to continue dealing even without limitations on liability, and that they were content with separate liability limits for individual inspections. Furthermore, unlike any of the cases that found the acceptance of a written contract based on other conduct, the October 10 letter and the November 30 telephone call do not directly or explicitly reference one another, and could easily have been directed at something else, most likely the seventh project. There is no good way to determine, as there was in *Landmark* and *Amelco* but was not in *Lundin,* whether the parties were acting under the October 10 limitation of liability rather than merely the November 30 accord. Finally, as in *Lundin,* Pratt has actually denied that it acted based on the October 10 letter.

Contrary to the majority, I also believe that the case falls within the ambit of our decision in *Pace Communications, Inc. v.*

*Moonlight Design, Inc.,* 31 F.3d 587 (7th Cir.1994). In *Pace,* the parties in a diversity case disputed the meaning of the phrase "current rate" in a contract calling for payment based on that rate. If "current" meant 1991 or 1992, as the plaintiff contended, the sum owed would be above $50,000; if "current" referred to 1990, as the defendant contended, the sum owed would be below $50,000. The court, after a bench trial, found for the plaintiff. On appeal, the defendant argued that plaintiffs could not recover the jurisdictional minimum, relying on its interpretation of current. In concluding that the jurisdictional requirement had been met, we stated, "Putting aside, for a moment, the merits of which year's rates should apply, there was surely at least a good faith argument to be made … that the 1991 rates were applicable. There is no doubt that diversity jurisdiction was properly had." *Id.* at 591–92. The thrust of this conclusion is that even had the plaintiff lost on appeal, we would still have retained jurisdiction simply because the plaintiff had argued in good faith. In the present case, Pratt also has a good faith argument regarding its oral contract. The timing of a decision to grant a 12(b)(1) motion, outside of its value as an indicium of the worthiness of the plaintiff's case, is more or less irrelevant to the rule of law expressed in *Pace.*

Certainly, courts have a duty to resolve the question of whether litigants belong in the courtroom before deciding what is a jury question and what is not. As the Third Circuit has remarked, "[w]e are not persuaded by the argument that a termination prior to trial deprives a 'plaintiff of his present statutory right to a jury trial.' … Indeed, such an argument begs the question, for the precise issue is whether plaintiff has a statutory right to enter the courtroom for any trial, jury or otherwise." *Nelson v. Keefer,* 451 F.2d 289, 293 (3d Cir.1971) (citations omitted). But where the plaintiff has presented more than a colorable issue regarding

---

**9.** Nor does this standard leave the limits of federal jurisdiction "unenforceable," as the majority contends. See Majority Op. at 352. The diversity statute permits the district court to deny costs to, and even impose them on, the plaintiff if she recovers less than the jurisdictional minimum, 28 U.S.C. § 1332(b), while Federal Rule of Civil Procedure 11, for which we have a very deferential standard, *see Mars Steel Corp. v. Continental Bank N.A.,* 880 F.2d 928 (7th Cir.1989) (*en banc*), permits district courts to sanction attorneys who have made unwarranted claims.

the amount in controversy, courts should accept that presentation and move on. Otherwise, we are encouraging too much jurisdictional maneuvering at the outset of litigation. True, as the majority argues, a tighter standard may drive a few cases off the federal docket. But that standard also prompts the question whether "the game [is] really worth the candle?" Paul M. Bator, et al., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 1749 (Foundation, 3d ed. 1988). In discouraging a few litigants from filing in federal court, we are also encouraging more of those properly here to engage in somewhat lengthy pre-trial quarrels that may do little but add to the district courts' motion practice.

### III.

Federal courts have an obligation not to exercise jurisdiction where they lack it, but they have a concurrent and equally commanding obligation to decide cases within their jurisdiction. As the majority notes, if Pratt remained in federal court, it might be well on its way to a $5,000 recovery. But that is its choice. It has, in my view, satisfied the requirements of our diversity jurisdiction. For the reasons stated above, I respectfully dissent.