Ernest NELSON, 3rd, a minor, by his parents and natural guardians, et al., Appellant in No. 19416.

v.

Ernest KEEFER and Frank Keefer

v.

Howard BRINKLEY and Walter G. Locke, Third Party Defendants.

Appeal of Ernest J. NELSON, Jr., in No. 19417.

Appeal of Patsy NELSON, in No. 19418.

Nos. 19416–19418.

United States Court of Appeals, Third Circuit.

Submitted on Briefs Sept. 24, 1971.

Decided Nov. 15, 1971.

As Amended Dec. 17, 1971.

---

Bernard ·J. McAuley, Wayman, Irvin, Trushel & McAuley, Pittsburgh, Pa., for appellants.

William K. Herrington, Weis & Weis, Pittsburgh, Pa., for appellees Ernest Keefer and Frank Keefer.

Arthur R. Gorr, Stein and Winters, Pittsburgh, Pa., for appellee Locke.

Before VAN DUSEN, ALDISERT and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

These appeals question the propriety of dismissing a personal injury diversity action at pre-trial because the district court concluded that it appeared "to a legal certainty" that the claims were "really for less than the jurisdictional amount" [1] of $10,000.[2]

Appellants concede that the court had the power to determine the facts requisite to jurisdiction, Wetmore v. Rymer, 169 U.S. 115, 18 S.Ct. 293, 42 L.Ed. 682 (1898), but contend that the cause should not have been terminated at pre-trial because of the possibility of adducing proof later as to the extent of the injuries.

■ Thus posited, the issue is whether the facts alleged at pre-trial supporting the complaint were legally insufficient to give rise to a $10,000 claim. St. Paul Mercury Indemnity Co. v. Red Cab Co., *supra*; Gray v. Occidental Life Insurance Co. of California, 387 F.2d 935 (3rd Cir. 1968); Jaconski v. Avisun Corp., 359 F.2d 931 (3rd Cir. 1966); Wade v. Rogala, 270 F.2d 280 (3rd Cir. 1959). It is appropriate to emphasize that "this court has taken the lead in recognizing diversity jurisdiction over an entire lawsuit in tort cases presenting closely related claims based, in principal part at least, on the same operative facts and normally litigated together, even though one of the claims, if litigated alone, would not satisfy a requirement of diversity jurisdiction." [3] Thus, if any of the three plaintiffs meets the jurisdictional amount, we will extend hospitality to the other claims.[4]

In their combined pre-trial statement, appellants allege that, as a result of an automobile accident caused by defendant's negligence, the minor son sustained a thoracic lumbar sprain, and, as of August 20, 1968—three years after the August 21, 1965 injury—he had incurred a physician's bill of $95.50, hospital ex-

---

1. St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938).

2. 28 U.S.C. § 1332. *Diversity of citizenship; amount in controversy; costs*
   (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—
   (1) citizens of different States;
   \*     \*     \*     \*     \*

3. Jacobson v. Atlantic City Hospital, 392 F.2d 149, 153 (3rd Cir. 1968). See Wilson v. American Chain & Cable Co., 364 F.2d 558 (3rd Cir. 1966); Borror v. Sharon Steel Co., 327 F.2d 165 (3rd Cir. 1964). *See also* American Law Institute Study of the Division of Jurisdiction Between State and Federal Courts, § 1301(e).

4. See Schwab v. Erie Lackawanna Railroad Co., 438 F.2d 62, 70, n. 18 (3rd Cir. 1971). Whether we receive them under concepts of "pendent" or "ancillary" jurisdiction, this court has deemed the doctrine of United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), to extend to diversity cases where the "claims \* \* \*, 'derive from a common nucleus of operative fact,' particularly where 'considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding. \* \* \*'" Jacobson v. Atlantic City Hospital, *supra*, 392 F.2d at 155.

penses of $15.00, and a $25.78 bill for a back brace. Reports of physicians indicate that he was seen by them on four occasions: August 21, 1965, September 1, 1965, November 29, 1965, and February 6, 1968. X-rays taken on August 24, 1965, and November 26, 1965, were negative.

The wife-plaintiff was diagnosed as having sustained a hematoma of the skull, neck lash, and contusions of the right shoulder and right ribs. She was seen by her physician on August 23, 1965, and had an x-ray taken on August 25, 1965, which proved negative. The physician issued a report on October 31, 1966, revealing treatment on August 23, 1965, for which he submitted a bill for $163.00. The bill for the x-rays at St. Luke's Hospital amounted to $65.00, and there was an additional Mercer College Hospital bill for $30.00.

The husband-father supported his claim with the following:

| | |
|---|---|
| Dr. Brown ........... | $322.75 |
| St. Luke's Hospital .... | 262.75 |
| Drugs ............... | 18.00 |
| Property Damage ....... | 727.69 |

Dr. Brown's report of October 31, 1966, indicated that Nelson's first treatment was on August 24, 1965, that the diagnosis was "neck lash, bruise left shoulder, pain over lumbar region with tenderness over spleen" and that Nelson "still has pain in neck and shoulder." It is significant that in the 1966 report, Dr. Brown made no attempt to relate the accident to Nelson's hospitalization from August 25 to 28, 1965, which apparently was treatment for "[d]iarrhea, undetermined etiology," including x-rays showing duodenal ulcer symptomotalogy. In analyzing Nelson's medical expenses, the trial court characterized the bills of the physician and hospital as "of doubtful relation of entire bill to the accident because the hospital treatment and Dr. Brown's records deal mostly with his treatment for

diarrhea and pre-existing hemorrhoids." Indeed, in answers to interrogatories, Nelson stated "no loss of compensation (from employment) is being claimed," and to the question: "How much time in weeks and days did you lose from work as a result of the injuries sustained in the accident," he responded, "Not applicable."

Before we apply these facts to the appropriate law, it becomes necessary to observe that other circuits have attributed more sweep to the rule of Wade v. Rogala, *supra,* than is set forth in the holding of the case.[5]

We did not there say that in all cases where there were intangible factors such as pain, suffering and inconvenience, the cause was required to be submitted to a jury. We did say that "[t]he necessary choice, except in the flagrant case, where the jurisdictional issue cannot be decided without the ruling constituting at the same time a ruling on the merits, is to permit the cause to proceed to trial." 270 F.2d at 285.

█ It is our intention to require removal from the trial list of those "flagrant" cases where it can be determined in advance "with legal certainty" that the congressional mandate of a $10,000 minimum was not satisfied. Although adhering to Wade v. Rogala, we have subsequently stated:

> There is small difficulty in applying this rule when the damages claimed are liquidated, but when the damages are unliquidated, as in the instant case, there is no exact yardstick to measure recovery even when most, if not all the operative facts are known. One of the tools developed for determining the intangible factors relating to the amount in controversy is the requirement that a plaintiff must claim the necessary amount in "good faith". * * *
>
> * * * [T]he basic criterion for determining "good faith" is that "[i]t

5. See Jones v. Landry, 387 F.2d 102, 105–106 (5th Cir. 1967), citing Wright, Federal Courts, § 33; Deutsch v. Hewes

Street Realty Corp., 359 F.2d 96 (2nd Cir. 1966).

must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. [283] 288–289, 58 S.Ct. [586] 590 [82 L. Ed. 845] (1938). See also Horton v. Liberty Mutual Insurance Co., 367 U.S. 348, 81 S.Ct. 1570, 6 L.Ed.2d 890 (1961); Brough v. Strathmann Supply Co., Inc., 358 F.2d 374 (3 Cir. 1966). The test then is not what amount the plaintiff claims in the *ad damnum* clause of his complaint, but rather, whether it appears to a "legal certainty" that he cannot recover an amount above the jurisdictional minimum. Cumberland v. Household Research Corp. of America, 145 F.Supp. 782 (D.Mass.1956); Cohen v. Proctor & Gamble Distributing Co., 16 F.R.D. 128 (D.Del.1954). It follows, therefore, that in order to find a plaintiff's claim lacking in "good faith", the court must be able to conclude from the record before him that the plaintiff cannot recover a sum by way of damages above the $10,000 jurisdictional floor.

Jaconski v. Avisun Corp., *supra*, 359 F.2d at 934, 935.[6]

█ We are not persuaded by the argument that a termination prior to trial deprives a "plaintiff of his present statutory right to a jury trial." See Deutsch v. Hewes Street Realty Corp., *supra*, 359 F.2d at 100. Indeed, such an argument begs the question, for the precise issue is whether plaintiff has a statutory right to enter the courtroom for any trial, jury or otherwise. The corollary suggestion that the remedy lies with Congress is similarly specious,[7] for the reality is that Congress *did* act in 1958 in raising the amount in controversy from $3,000 to $10,000.[8]

The stated purpose of the 1958 amendment as urged by the Judicial Conference of the United States was to:

make jurisdiction available in all *substantial* controversies where other elements of Federal jurisdiction are present. The jurisdictional amount should not be so high to convert the Federal courts into courts of big business nor so low as to fritter away their time in the trial of petty controversies.

U.S.Code Cong. and Admin.News, Senate Report No. 1830, 85th Cong., 2d Sess., p. 3101 (1958) (emphasis added).

Moreover, the Supreme Court recently announced that the congressional purpose "was to check, to some degree, the rising caseload of the federal courts, especially with regard to the federal courts' diversity of citizenship jurisdiction." Snyder v. Harris, 394 U.S. 332, 339–340, 89 S.Ct. 1053, 1058, 22 L.Ed.2d 319 (1969). There, the Court explicitly reaffirmed its earlier expression of congressional intention in Healy v. Ratta, 292 U.S. 263, 269–270, 54 S.Ct. 700, 703, 78 L.Ed. 1248 (1933):

From the beginning suits between citizens of different states, or involving

---

6. As the Seventh Circuit recently noted, "it is not incumbent upon a plaintiff to show to an absolute certainty that he will obtain a verdict in excess of $10,000. Instead, before a suit will be dismissed for lack of jurisdiction, it must appear to a legal certainty that he will *not* recover that amount." Jeffries v. Silvercup Bakers, Inc., 434 F.2d 310, 311–312 (7th Cir. 1970).

7. "If access to federal district courts is to be further limited it should be done by statute and not by court decisions that permit a district court judge to prejudge the monetary value of an unliquidated claim." Deutsch, *supra*, 359 F.2d at 100.

8. July 25, 1958, Pub.L. 85–554, § 2, 72 Stat. 415. In 1789 the jurisdictional amount was fixed by the First Judiciary Act at $500. In 1801 the amount was lowered to $400, but in the next year the $500 figure was restored, and this remained the required amount until 1887 and 1888 when it was increased to $2,000. The Judicial Code of 1911 provided a further increase to $3,000. Report of Committee on Jurisdiction and Venue of the Judicial Conference of the United States, U.S.Code Cong. and Admin.News, 85th Cong., 2d Sess. pp. 3120–3121.

federal questions, could neither be brought in the federal courts nor removed to them, unless the value of the matter in controversy was more than a specified amount. Cases involving lesser amounts have been left to be dealt with exclusively by state courts, except that judgment of the highest court of a state adjudicating a federal right may be reviewed by this Court. Pursuant to this policy the jurisdiction of federal courts of first instance has been narrowed by successive acts of Congress, which have progressively increased the jurisdictional amount. The policy of the statute calls for its strict construction. The power reserved to the states, under the Constitution, to provide for the determination of controversies in their courts may be restricted only by the action of Congress in conformity to the judiciary sections of the Constitution. See Kline v. Burke Construction Co., 260 U.S. 226, 233–234 [43 S. Ct. 79, 67 L.Ed. 226, 24 A.L.R. 1077]. Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined. See Matthews v. Rodgers, *supra* [284 U.S. 521] at 525 [52 S.Ct. 217, 76 L.Ed. 447]; compare Elgin v. Marshall, 106 U.S. 578 [1 S.Ct. 484, 27 L.Ed. 249].

The relationship of personal injury claims to diversity actions is well known. In fiscal year 1970, of a total of 22,854 diversity cases, 14,447 were tort cases, of which 13,794 involved personal injuries. In fiscal 1969, of 21,675 diversity cases, 14,345 were tort, and 13,831, personal injuries. In fiscal 1968, of 21,009 diversity cases, 13,795 were tort, and 13,435 personal injuries.[9] And it is a well-known fact of courtroom life that in personal injuries litigation the intangible factor of "pain, suffering, and inconvenience" constitutes the largest single item of recovery, exceeding by far the out-of-pocket "specials" of medical expenses and loss of wages.[10]

Given the congressional intention to eliminate trials of unsubstantial diversity cases, and mindful that personal injury actions comprise a majority—at least 60 per cent—of diversity controversies, and that the intangible factor of pain, suffering, and inconvenience usually constitutes the largest single item of damages in personal injury claims, we have no difficulty in concluding that Congress intended that trial judges exercise permissible discretion prior to trial in adjudicating challenges to jurisdiction.

Nor can we bring ourselves to believe that the congressional mandate can be thwarted by the simple expedient of inflating the complaint's *ad damnum* clause. It is a phenomenon of both state[11] and federal[12] trial courts that

---

9. Annual Reports of the Director of the Administrative Office of the United States Courts, Tables C–1, 1970; C–2, 1969; C–2, 1968.

10. In Domeracki v. Humble Oil & Refining Co., 443 F.2d 1245, 1249–1250 (3rd Cir. 1971), we said:

Our analysis begins with the elementary rule of damages in personal injuries actions: a plaintiff should be compensated (1) for monies of which he has been deprived and which presumably he would have received had he not been injured, including wages and earnings, past and future; and (2) for the expenses, inconveniences, and suffering which have been thrust upon him by virtue of his injuries. The purpose, then, of personal injury compensation is neither to reward the plaintiff, nor to punish the defendant, but to replace plaintiff's losses.

11. Studies made in Pennsylvania's Allegheny County Court of Common Pleas, a court of general jurisdiction, at a time when a companion court, County Court of Allegheny County, existed for civil cases of less than $5,000 in value, disclosed that 73.6% of all verdicts and settlements were $5,000 or under; 44.3%, $2,500 or under; and only 26.4% over $5,000. Aldisert, "Is Your Good Counsel Also Wise?", 29 U.Pitt.L.Rev. 414 (1968). At the time of this study, Penn-

the majority of actual recoveries by verdict and settlement are less than the jurisdictional amount. It has been observed that despite the increase in the jurisdictional amount, there has been no reduction in private civil litigation, including tort cases, and that the "reason for this unfortunate result is the inflexibility of the applicable 'good faith-legal certainty' test." [13] We agree. But "the fault is not in our stars, but in ourselves." Because the federal judiciary has been too timid to execute the congressional mandate in personal injury actions, we have all contributed to clogging dockets, monopolizing trial rooms, and committing the expense and energies of our system to a plethora of cases which do not belong in federal courts.

■ We are quick to recognize that the "inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction." St. Paul Mercury Indemnity Co. v. Red Cab Co., *supra,* 303 U.S. at 289, 58 S.Ct. at 590. Furthermore, we acknowledge readily the danger of depriving a plaintiff of a possible right to a jury trial. But the day has long gone in this circuit when a jury has had the last word on the size of personal injury awards. "This court has succinctly and frequently stated that the question of excessiveness of a verdict is primarily a matter to be addressed to the sound discretion of the trial court." Russell v. Monongahela Ry. Co., 262 F.2d 349, 352 (3d Cir. 1958). Moreover, we have indicated that the trial court should not permit a jury verdict to stand where

there has been a "showing that the jury was biased or acted capriciously or unreasonably." Derewecki v. Pennsylvania R. Co., 353 F.2d 436, 444 (3d Cir. 1965). Nor is the court of appeals without responsibility in reviewing the verdict. In Grunenthal v. Long Island R. Co., 393 U.S. 156, 159, 89 S.Ct. 331, 333, 21 L.Ed. 2d 309 (1968), the Supreme Court discussed the Second Circuit's standard of review announced in Dagnello v. Long Island R. Co., 289 F.2d 797, 806 (2d Cir. 1961):

> "[W]e appellate judges [are] not to decide whether we would have set aside the verdict if we were presiding at the trial, but whether the amount is so high that it would be a denial of justice to permit it to stand. We must give the benefit of every doubt to the judgment of the trial judge; but surely there must be an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law."

We read *Dagnello,* however, as requiring the Court of Appeals in applying this standard to make a detailed appraisal of the evidence bearing on damages.

The Court stated that this standard has been variously phrased as " 'grossly excessive,' 'inordinate,' 'shocking to the judicial conscience,' 'outrageously excessive,' 'so large as to shock the conscience of the court,' 'monstrous.' " 393 U.S. 159, n. 4, 89 S.Ct. 333.

■ Analogizing the authority of the court to reject a jury's verdict

---

sylvania Rules of Civil Procedure required the *ad damnum* clause to state that the amount demanded exceeded the jurisdictional amount of the Allegheny County Court ($5,000), Pa.R.Civ.Pro. 1044(c) (12 P.S.Appendix).

12. "The records of the Administrative Office of judgments after trial in diversity cases terminated in the fiscal year 1961 (some few of which were probably filed before the 1958 increase in jurisdictional amount from $3,000 to $10,000 became effective) show that 614 out of 1,268 reported judgments, 48 per

cent of the total, were for less than $10,000, and that the amount of the median judgment in these cases was *$3,793.* The amount of the median claim in these same cases was *$32,200.* While it is obvious that there are a good many cases where counsel might reasonably hope for a judgment over $10,000 and obtain one for substantially less than that, it seems clear that the jurisdiction is being abused." Commentary § 1301(d), ALI Study, *supra,* at 116.

13. Jaconski v. Avisun Corp., *supra,* 359 F.2d at 935.

through the time-honored practice of remittitur, Russell v. Monongahela Ry. Co., *supra,* we have no difficulty in recognizing a corollary power in that same court to evaluate a case prior to trial where sufficient information has been made available through pre-trial discovery and comprehensive pre-trial narrative statements which disclose medical reports. Assuming that claimed tangible items of damage legally related to the cause of action will be taken as true, the court should be able to determine what the *Dagnello* court perceived to be the "upper limit" of a permissible award that includes tangible recoverable items such as medical special and lost wages damage items as well as the intangibles of pain, suffering, and inconvenience.[14] If this "upper limit" does not bear a reasonable relation to the minimum jurisdictional floor, utilizing the test of *St. Paul Mercury Indemnity Co.,* we perceive no legal obstacle to a pre-trial determination that a personal injury action does not satisfy federal jurisdictional requirements.[15]

■ Where the allegation of jurisdictional amount was traversed, as here, "[t]he burden of showing by the admitted facts that the federal court has jurisdiction rests upon the complainants," Gibbs v. Buck, 307 U.S. 66, 72, 59 S.Ct. 725, 729, 83 L.Ed. 1111 (1939).[16] "[A]n inquiry into the existence of jurisdiction * * * obviously for the purpose of determining whether the facts support" the allegations is authorized by McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936):

> * * * the authorized inquiry is primarily directed to the one who claims that the power of the court should be exerted in his behalf. As he is seeking relief subject to this supervision, it follows that he must carry throughout the litigation the burden of showing that he is properly in court. The authority which the statute vests in the court to enforce the limitations of its jurisdiction precludes the idea that jurisdiction may be maintained by mere averment or that the party asserting jurisdiction may be relieved of his burden by any formal procedure. If his allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof * * * by a preponderance of evidence.

After reviewing the plaintiffs' pretrial narrative statement, on July 20, 1970, the district court recognized that the issue had been joined and ruled: "This is a matter which should be determined by an appropriate proceeding prior to trial. Counsel for plaintiff will be required to show the evidentiary basis of his claim of diversity jurisdiction at the time of the Pretrial Conference set for Thursday July 23, 1970 at 10:00 A. M." At the appointed time, after lengthy discussion, the court said:

> I don't have the evidentiary material before me. Any party defendant who

---

14. To be sure, depending upon the claim, other intangibles are often recoverable, *e. g.,* loss of future earning capacity reduced to present worth.

15. Although in a remittitur the claimant is given the option of a new trial, we consider this to be a distinction without a difference. An order of remittitur is a judicial determination that the verdict is excessive as a matter of law. Banks v. Chicago Grain Trimmers Ass'n, 390 U.S. 459, 88 S.Ct. 1140, 20 L.Ed.2d 30 (1968). The reality is that if there is a verdict for the claimant upon retrial, it cannot, from a practical standpoint, be

expected to be sustained in an amount previously deemed excessive.

16. Jaconski, *supra,* 359 F.2d at 934; Industrial Electronics Corp. v. Cline, 330 F.2d 480, 482 (3rd Cir. 1964); see also Wood v. Citronelle-Mobile Gathering System Co., 409 F.2d 367, 369 (5th Cir. 1968); Rapoport v. Rapoport, 416 F.2d 41, 44 (9th Cir. 1969); Massachusetts State Pharmaceutical Ass'n v. Federal Prescription Service, Inc., 431 F.2d 130, 132 (8th Cir. 1970); Barron & Holtzoff, Federal Practice and Procedure (Wright Ed.) § 24, p. 107, n. 50.2. Forrester, Currier, and Moye, Federal Jurisdiction and Procedure, 420 (1970).

may be liable on these may question the jurisdiction. I don't see anything more I can do now. * * * I will retain this case for 30 days to entertain any motions filed by any party to have the jurisdictional amount separately tested. In the meantime, within 20 days, I want the plaintiff to file a supplemental pretrial narrative which clearly sets forth the nature of the injuries and treatment that is claimed for each of the parties and specifically shows that a medical witness will support the causal relation between the father's hospitalization on the 25th of August where we now have an ambiguous report as to what he was really in the hospital for. * *

(Counsel for appellants): I will supply the Court with an up-to-date report from the doctor.

THE COURT: We will ask you to supplement your pretrial within 20 days with medical reports which will sustain the causal relationship of the treatment or hospitalization rendered to the accident.

I will retain it for 30 days for any further pretrial conference that may be necessary on that or any motion raising the question in any way to determine the jurisdictional amount before trial.

Plaintiffs failed utterly to avail themselves of this opportunity to bolster the jurisdictional basis of their action. The defendants, however, augmented the record with the results of a physical examination performed by their physician on July 23, 1970, which reported no objective signs of injury, and findings of no permanent injury or disability. On August 28, 1970, defendants filed a motion for summary judgment, relying on the pre-trial record as supplemented by defendants. In addition to filing no supplemental pre-trial report, appellants did not respond to the summary judgment motion with any additional or opposing documents or affidavits. F.R.Civ.P. 56 (b).

Thus, at the time the district court ruled on the summary judgment motion

in September, 1970, appellants were relying on an October 31, 1966, medical report for the father, which the court had already indicated was of spurious jurisdictional relevance. Indeed, the court had specifically ordered evidence supporting the causal relation between the accident and the father's hospitalization. There seemed to be little doubt of the insufficiency of the minor's claim and that of Mrs. Nelson. In any event, no supplemental reports were filed for these appellants either, as previously directed by the court, "clearly [setting] forth the nature of the injuries and treatment that is claimed for each of the parties."

Taking plaintiff's factual allegation in the pre-trial record as true, as it was required to do, the district court noted that the father admitted he had no claim for lost wages, and concluded that

> with minor injuries, small medical bills of uncertain causal connection, no loss of income, no absence from work, it is impossible to see how father-plaintiff's damages can in good faith ever reach the jurisdictional minimum of $10,000, even with the added assistance of the small medical bills of his wife and son, and damages to his auto. * * * We have proceeded in the assumption that neither the wife's independent claim nor the son's independent claim meet the test. The record is meager. The wife plaintiff's bills total $258.00. The medical reports are brief, x-rays show no skeletal injuries, the medical prognosis was good, there is no claim for loss of earnings or impairment of earning power. The son plaintiff's independent claim has the support of medical expenses of $137.00. No record of disability or earnings impairment is shown.

Our scope of review under these circumstances is similar to that which is utilized in review of a trial court's determination that a verdict is "excessive" or "capricious." Grunenthal v. Long Island R. Co., *supra*; Derewecki v. Pennsylvania R. Co., *supra*. Accord-

ingly, although we must "give the benefit of every doubt to the judgment of the trial judge," we must "make a detailed appraisal of the evidence bearing on damages." Having done so, we find that the district court gave plaintiffs ample opportunity, at the pre-trial stage, to justify their jurisdictional claim. Convinced to a legal certainty that the evidence would not permit it to sustain a verdict for plaintiffs of $10,000 or more, the district court did not—and indeed could not—allow the case to proceed to trial.

Cognizant of the competing arguments heretofore rehearsed, we hold that the district court did not err in concluding that the statutory jurisdictional minimum could not be gleaned from the facts averred in support of the complaint. And since plaintiffs' legally recoverable ceiling did not at its apex reach the federal jurisdictional floor, the judgment of the district court will be affirmed.