James **SHIMSKY**

v.

**FORD MOTOR COMPANY.**

**Civil Action No. 96–3966.**

United States District Court, E.D. Pennsylvania.

Jan. 9, 1997.

Glenn Gerber, Power & Gerber, P.C., Media, PA, for plaintiff.

Ronald S. Yuro, Dobis & Reilly, P.A., Livingston, NJ, for defendant.

## MEMORANDUM

DALZELL, District Judge.

After the October 23, 1996 arbitration of this lemon law case, defendant filed a demand for trial *de novo* pursuant to Local R.Civ.P. 53.2.7. On November 26, 1996, prior to setting the matter for trial, we ordered the parties to file memoranda "addressing the Court's jurisdiction over the subject matter in view of the market value reduction the alleged defect has caused to plaintiff's car". Upon consideration of the parties' memoranda, it became apparent that it was necessary to have an evidentiary hearing, which we held on December 23, 1996.

As a result of this activity, the defendant takes the position that we lack jurisdiction over the subject matter. For the reasons that follow, we agree.

Plaintiff James Shimsky alleges that the damages to which he is entitled in this diversity action exceed the jurisdictional minimum, Complaint ¶ 3. Specifically, Shimsky claims that his "Lemon Law damages in this situation (without any attorney fees, finance charges, and without exemplary damages under the [Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1 *et seq.*]) equals the $16,330.00 purchase price of the vehicle plus $759.00 in sales taxes and $62.50 in document and title fees plus finance charges," Pl.Mem. at 4th unnumbered page.

■ While the jurisdictional amount plaintiff alleges controls unless the defendant shows "to a legal certainty" that the claim is inadequate, *St. Paul Mercury Indemnity Co.*

*v. Red Cab Co.*, 303 U.S. 283, 288, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938), we are not bound by the complaint's conclusory allegations, but may look through them to see if plaintiff has supported "them by competent proof ... by a preponderance of evidence", *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *see also Nelson v. Keefer*, 451 F.2d 289, 294–96 (3d Cir.1971).

■ In response to plaintiff's allegations, defendant Ford Motor Company correctly notes that Shimsky has misinterpreted the lemon law damages provision, which provides that "the manufacturer shall ... accept return of the vehicle from the purchaser and refund to the purchaser the full purchase price, including all collateral charges, less a reasonable allowance for the purchaser's use of the vehicle", 73 Pa.Stat.Ann. § 1955. Thus, a plaintiff like Shimsky receives back his purchase price, *but* must surrender the car, a deduction, as we shall show, of a readily-ascertainable value.

At the December 23 hearing, the parties stipulated that Shimsky in fact paid $16,330.00 for his 1995 Ford Contour, Model GL, N.T. at 3. Together with sales tax, title fee, and documentary fee, Shimsky's total out-of-pocket expenditure for the car was $17,151.50, *see* N.T. at 3–4 (listing costs totalling $17,151.50).

At the hearing, Ford's expert witness, Richard Woytowich, testified that plaintiff was unhappy with a "buzzing noise" during acceleration. Mr. Woytowich confirmed that, when he road tested the Contour, there was indeed a "buzz/tizz type of noise", N.T. at 46, at 1500 to 2400 r.p.m. Mr. Woytowich also testified that the problem with the Contour would be fixed by replacing the engine's Exhaust Gas Recirculation Vacuum Regulator Solenoid ("EVR"), N.T. at 48–49. According to him, the cost for labor and part for the replacement of the EVR would be $75.00, N.T. at 52.

Although Mr. Woytowich testified that the minimum auction value of the subject car at auction would be $10,250.00,[1] N.T. at 60, he conceded that this value was as of the No-

---

1. Of perhaps historical interest, at the time of the arbitration on October 23, 1996, the Ford Con-
tour had 7,568 miles on it, N.T. at 5.

vember 25, 1996 edition of the N.A.D.A. "Blue Book", which does not relate to the value of the car as of the time the complaint was filed, namely, May 28, 1996. Without objection, Ford was granted leave to file a supplemental affidavit of Mr. Woytowich to set forth the value of the car according to the "Blue Book" published nearest May 28, 1996. It turns out that the May 13, 1996 "Blue Book" shows that the car's value at that time was $11,550.00, Woytowich aff. at ¶ 7.

It is quite clear, and undisputed by Mr. Woytowich's testimony, that the figure in the "Blue Book" constitutes a minimum price a dealer can expect at an auction to the trade of the car in question. According to his uncontroverted testimony, the prices listed in the "Blue Book" are based upon actual transaction prices at weekly auctions that are limited to the trade. As such, the "Blue Book" prices are both current and conservative, the latter in the sense that the price represents a dealer's worst-case economic scenario if he cannot sell a car to the public off his lot within thirty days of its return. N.T. at 22–23.

Given the undisputed realities of the market Mr. Woytowich described, we are fortified in our view that our *Red Cab–McNutt* enterprise in the lemon law context is different in kind from what it would be in, say, a case involving bodily injury. Clearly, only a jury can appraise the value of pain and suffering, loss of enjoyment of life, and similar losses. The record here shows that, by contrast, the market constantly makes appraisals of loss of the subject property, and that such appraisals are readily ascertainable. We may therefore safely rely upon those market-determined values in discharging our duty of assuring that we have jurisdiction over the subject matter of such suits.

Because the value of Shimsky's car is readily ascertainable, and since, under the

lemon law, he must surrender his car in order to get the purchase price back, it is proper to deduct the market value of the car in question as of the date of filing to determine the amount in controversy. The base figure, for this calculation, is $5,601.50 ($17,-151.50 minus $11,550.00). If we were to treble this sum, we would still have a base of only $16,804.50 against which to add a reasonable attorney's fee. To be reasonable, such a fee could not possibly equal six times the market loss or double the trebled amount. *See Neff v. General Motors Corp.,* 163 F.R.D. 478 (E.D.Pa.1995); *Hilferty v. Chevrolet Motor Div.,* 1996 WL 287276 (E.D.Pa. May 30, 1996).[2]

This record thus leaves no doubt that, taking even the most conservative value,[3] the amount in controversy in this case does not approach $50,000.01, and so we find that defendant has met its burden of proving to a legal certainty that the amount in controversy, even with trebling and reasonable attorney's fees, could not exceed $50,000. As a result, we find that we lack jurisdiction over the subject matter of this dispute.

---

**2.** To be precise, to reach $50,000.01, the counsel fee would have to be $33,195.51, which is 5.93 times the $5,601.50 market loss and 1.98 times the trebled amount of $16,804.50.

**3.** We say "most conservative" because we have made no "reasonable allowance" for the plaintiff's "use of the vehicle" given the undisputed reality that he at least as of October 23, 1996 had driven the car 7,568 miles. *See* n. 1, *supra.* The record does not disclose the mileage on the car

as of the date of filing. It seems reasonable to assume that the value of six months' use of a $17,151 car at least equals the finance charges plaintiff says he has incurred, which he reports were "approximately $1,000" as of the date his counsel filed his memorandum on this issue. Pl.Mem. at 4th unnumbered page. Presumably, as of May 28, 1996, those charges would be half this asserted sum.