NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 15-4039, 16-1654,16-1655
_____

IN RE: PAULSBORO DERAILMENT CASES

ALICE BREEMAN, S.B.-R., A.B.-R. AND H.B.-R.,
Appellants in 15-4039

BRYAN EVERINGHAM,
Appellant in 16-1654

RYAN RAGONE,
Appellant in 16-1655
_____

On Appeal from the United States District Court
for the District of New Jersey
(D. N.J. Nos. 1-12-cv-07468, 1-13-cv-00784, 1-13-cv-03350,
1-13-cv-07410)
District Judge: Honorable Robert B. Kugler
_____

Argued
December 6, 2016

Before: FISHER[*], KRAUSE and MELLOY[**], *Circuit Judges*.

(Filed: August 28, 2017)

---

[*] Honorable D. Michael Fisher, United States Circuit Judge for the Third Circuit, assumed senior status on February 1, 2017.
[**] Honorable Michael J. Melloy, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

———————

OPINION[***]

———————


Mark R. Cuker [Argued]
Michael J. Quirk
Williams Cuker Berezofsky LLC
1515 Market Street, Suite 1300
Philadelphia, PA 19102

David M. Cedar
Cedar Law Firm, LLC
1908 Marlton Pike East
Cherry Hill, NJ 08003
     *Attorneys for Breeman Appellants*

Kevin McCann
Matthew Weng [Argued]
Chance & McCann
201 W Commerce St
Bridgeton, NJ 08302
     *Attorneys for Appellants Everingham, Ragone, and Johnson*

Chad M. Clamage
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606

Evan M. Tager
Mayer Brown LLP
1999 K Street, Northwest
Washington, DC 20006-1101
     *Attorneys for Appellee CSX Transportation, Inc.*


Ralph G. Wellington

———————

[***] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Nancy Winkelman (argued)
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103

Ronald K. Wray, II (argued)
Gallivan, White & Boyd P.A.
55 Beattie Place, Suite 1200
Greenville, SC 29601
        *Attorneys for Appellee Consolidated Rail Corp., Norfolk Southern Railway Co.,
        and CSX Transportation, Inc.*

MELLOY, *Circuit Judge*.

On November 30, 2012, several train cars derailed while crossing Mantua Creek on a swing bridge near Paulsboro, New Jersey. One of the cars released over 20,000 gallons of vinyl chloride, creating an airborne chemical cloud. Plaintiff-appellants Alice Breeman and her children drove through the cloud repeatedly on the day of the spill. The other plaintiff-appellants are first responders who arrived on the scene shortly after the spill.

In several separate suits, the plaintiffs sued numerous parties, including Consolidated Rail Corporation ("Conrail"), the owner of the bridge. The plaintiffs sought compensation for alleged physical injuries, ongoing medical monitoring, emotional distress due to fears of increased cancer risk, and punitive damages. The district court consolidated cases for pretrial matters, ruled on several motions *in limine* regarding expert witnesses, granted summary judgment against the first responders, and granted partial summary judgment against the Breemans. In doing so, the district court noted that

the amount in controversy for the Breemans appeared insufficient to reach the $75,000 threshold for diversity jurisdiction. The district court ordered briefing on the issue and later concluded punitive damages were unavailable. The district court accordingly dismissed the Breemans' complaint, concluding the Breemans' alleged compensatory damages fell short of the jurisdictional threshold.

We need not discuss most of the issues addressed by the district court. Rather, as to the Breemans and two of the first responders, we conclude the allegations of injury fail to satisfy the $75,000 amount-in-controversy threshold for establishing federal diversity jurisdiction. Accordingly, we will dismiss their appeals without prejudice. We reach our conclusion without reference to the district court's underlying evidentiary and summary judgment rulings and rely, instead, on the plaintiffs' own allegations of injury as initially pleaded and as later clarified by the plaintiffs themselves. The third first responder, Marlo Johnson, did not timely file his appeal, and thus, we granted the motion to dismiss his appeal for lack of appellate jurisdiction.

I.

The swing bridge at the center of this case could be positioned "open" to permit boat traffic along the creek or "closed" to permit train traffic across the creek. From March through November, the default position for the bridge was open; from December through February, the default position was closed. When not closed and locked for the winter, the bridge could be moved as needed to permit rail traffic.

4

In the past, Conrail had employed a person to control the bridge and visually ensure the rails were locked for crossing. In 2003, however, Conrail changed to a computerized locking and signal system to indicate to approaching trains whether the bridge was properly aligned and locked for crossing. When functioning properly, the locking system used four slide locks, two on each side of the bridge. A proximity detector would sense when the locks were fully extended and generate a green signal. When the slide locks were one-half inch or more away from the detectors, the signal system would generate a red signal and audibly announce, "Paulsboro moveable bridge failed to operate."

In general, if a train approached the bridge and did not receive a green signal, the train would stop and an engineer or conductor would visually inspect the bridge to determine if the rails were in place and locked. If these persons were unable to obtain a green signal, they would call a dispatch control center to report their observations and obtain permission to cross. This procedure was set forth in a Conrail operating rule, providing that no trains were to cross a moveable bridge through a red signal unless a "qualified" employee ensured the bridge was fully locked and safe to cross. Northeast Operating Rules Advisory Committee Rule 241(d).

In the year prior to the derailment, thousands of trains passed over the bridge, and there were approximately two dozen reports of signal problems. Half of these reports came after Hurricane Sandy struck in October 2012. In response to each report, Conrail

employees conducted investigations and either addressed the problem or were unable to determine the cause of the problem.

On at least one occasion, Conrail hired a consultant, Hans Heidenreich, to inspect and diagnose the signal error at the bridge. Heidenreich was the designer of the programmable logic controller at the heart of the bridge's locking and signal system. He inspected the system on November 13 and 20, 2012. He was unable to diagnose the problem, but he was aware that the bridge was scheduled to be locked into the default, closed position on December 1. As such, he recommended to Conrail's Supervisor of Structures that Conrail seek permission to lock the bridge early for the winter to permit further inspection of electrical wiring. The Supervisor of Structures elected not to lock the bridge early. Heidenreich indicated his recommendation to close the bridge was related to functionality not safety. The Supervisor indicated he did not believe the recommended closure was a safety recommendation and believed continued use of the bridge would allow diagnosis of the intermittent signal failure.

Then, on November 30, a train approached the bridge. The bridge was in the closed position, but the signal system generated a "red" signal. Train engineer Mark Mather and conductor Wilbert den Ouden stopped the train. The conductor inspected the bridge and reported the rails were lined and locked. The engineer called a Conrail dispatch center to report the situation, explaining that the conductor had walked the rails and confirmed the rails were "locked and lined." The dispatch center gave permission for

the train to proceed across the bridge. When crossing the bridge, seven cars derailed, one of which ruptured and spilled 20,000 gallons of vinyl chloride into the creek, creating a vapor cloud.

The plaintiffs were near the bridge on the day of the derailment. New Jersey State Police Trooper Bryan Everingham worked near the bridge on the day of the derailment. He does not allege he experienced any adverse health effects on the day of the derailment. Rather, he alleges he developed headaches and sleeplessness in December 2012 or January 2013, and does not allege he sought medical treatment for these issues.

Officer Ryan Ragone helped evacuate residents from their homes immediately following the derailment. He alleges he developed severe watery eyes and nasal discharge at that time and later that day developed a cough that lasted through one night. He described these symptoms as having subsided and does not allege he sought medical treatment for these symptoms. He does not allege ongoing symptoms related to vinyl chloride exposure.

On the day of the derailment, Alice Breeman left her home with her three children to take them to a school and a day-care center. On her way, she drove through the cloud of vinyl chloride and its degradation products only to discover the school was closed. She drove back through the cloud to reach a different day-care provider nearer to the site of the derailment only to find that location also closed. Finally, she drove two blocks to a relative's home and walked her children into the home. She then attempted to drive to

work but began to feel lightheaded and dizzy. She turned around, retrieved her children, and drove them to her mother's home in another town.

Breeman reports that she started coughing, wheezing, and having nosebleeds. The following day, she went to an emergency room where she was diagnosed with vinyl chloride exposure, epistaxis, and reactive disease with bronchospasms. Two days after that, she went to a different emergency room complaining of dizziness, a tight chest, and shallow breathing. She was treated with a Ventolin nebulizer. Nine days after that, she visited her family doctor complaining of wheezing, nausea, and a headache. Her family doctor had seen many patients with similar symptoms and had consulted with a toxicologist for Conrail. The toxicologist told the doctor Paulsboro residents were not exposed to vinyl chloride at a concentration above 10 parts per million (ppm). Allegedly influenced by this information, Breeman's doctor diagnosed Breeman's continuing symptoms as due to "viral bronchitis or sinusitis" rather than vinyl chloride exposure. Breeman asserts she was exposed to a substantially greater concentration of vinyl chloride and the toxicologist provided inaccurate information to her doctor. Breeman alleges that she continues to cough, wheeze, and suffer shortness of breath. Breeman has been a smoker for 16 years, smoking half a pack per day. In addition, prior to the derailment, she suffered from hypertension, diabetes, acid reflux disease, and numerous upper respiratory tract infections.

Breeman's youngest child, who was one-year old at the time of the derailment, was also examined during Breeman's first visit to the emergency room, where the examining doctor said the child was fine. Breeman took this child to the emergency room again during her own visit to the emergency room two days after the accident. Like Breeman, this child received breathing treatments during this second visit. Breeman alleges this child developed "an aggressive cough that persisted for weeks." (Breeman Appellants' Br. 8) Breeman also alleges this child now contracts respiratory illness more frequently and such illnesses last longer than before the derailment. The child's pediatrician has prescribed a nebulizer for use if the child is sick, but the child is not otherwise under regular treatment for asthma or under the care of a pulmonologist. Breeman sought no medical treatment for her two older children.

It is undisputed that long-term, continued exposure to vinyl chloride, such as that experienced in an occupational setting, may increase the risk of cancer. It also is undisputed that a single, acute exposure to sufficiently high levels of vinyl chloride may cause irritation, dizziness, or headaches with more severe adverse effects at even higher levels. Breeman asserts that a sufficiently high level of acute exposure may cause death. The parties dispute vigorously whether a single, acute exposure to vinyl chloride increases the risk of cancer.

Through expert witnesses and in briefing on motions for summary judgment, the parties contested the concentrations of vinyl chloride exposure following the derailment,

9

whether a jury could find a one-time acute exposure to vinyl chloride capable of increasing a person's risk of cancer, whether the train's conductor was a "qualified" employee for purposes of inspecting the rail locks, and whether Conrail's training and operating procedures were adequate. The district court held that training issues were preempted by federal law and excluded the plaintiffs' medical-causation, railroad-operations, and railroad-engineering expert witnesses. The district court then granted summary judgment against the first-responders and against most of the Breemans' claims.

In addition, the district court questioned the amount in controversy as to the Breemans. Breeman argued (1) she and her children suffered physical injuries; (2) they suffered harm in the form of a need for future medical monitoring; and (3) punitive damages should be available thus multiplying the amount in controversy. Although Breeman alleged in her complaint that she and her children suffered emotional harm due to a fear of heightened cancer risks, she did not attempt to place a dollar amount on this harm in her arguments.

The district court concluded punitive damages were not available. Citing New Jersey law, the district court determined that punitive damages required malice or a willful disregard of a known risk of a high probability that harm would occur. The court then noted that no allegations tended to show any Conrail employees actually believed the bridge was unsafe and that, instead, Conrail had repeatedly acted to inspect the bridge

and its locking and signal system to understand and diagnose the problem. The district court also determined Alice Breeman's claims for physical injury and medical monitoring were, to a legal certainty, incapable of reaching the jurisdictional threshold. In so finding, the district court quoted Breeman's attorney who indicated Breeman sought no specific testing or monitoring; rather, she sought only general lifestyle counseling regarding healthy practices that might minimize the risk of cancer. The district court reached the same conclusion regarding the Breeman children, noting that the older two children actually did not allege any physical harm that had required a visit to a hospital or doctor.

After the district court dismissed the Breemans' complaint for lack of federal jurisdiction, they filed a similar suit in state court. The state court suit was pending as of the date of oral arguments in this appeal.

The Breemans and the first responders appeal. Regarding the jurisdictional amount in controversy, the Breemans argue the district court impermissibly looked at the record as it existed at the time of dismissal rather than when they commenced the action. In addition, they argue the facts in existence at commencement of the action do not show to a legal certainty that punitive damages are unavailable.

II.

11

We review *de novo* the legal determination of whether subject matter jurisdiction exists. *Shaffer v. GTE North, Inc.*, 284 F.3d 500, 502 (3d Cir. 2002). In addition, as a court of limited jurisdiction, we at all times possess the responsibility to ensure we hold jurisdiction over matters that come before us. *See id.* ("Although neither party had posed the question [of] subject matter jurisdiction . . . , nor had the district court focused on that issue, we raised the matter sua sponte—as every court is obligated to do when subject matter jurisdiction is in question."). The appellants all allege diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).

"[T]he diversity statute vests in the federal district courts original jurisdiction of 'all civil actions where the matter in controversy exceeds the sum or value of $75,000, . . . and is between . . . citizens of different States . . . .'" *In re Lipitor Antitrust Litig.*, 855 F.3d 126, 150 (3d Cir. 2017) (quoting 28 U.S.C. § 1332(a)(3)). A plaintiff asserting diversity jurisdiction bears the burden of demonstrating that the amount in controversy exceeds $75,000. *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 395 (3d Cir. 2016). The burden is not heavy, as "the sum claimed by the plaintiff controls if the claim is apparently made in good faith." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938) (footnote omitted). As such, "[i]t must appear to *a legal certainty* that the claim is really for less than the jurisdictional amount to justify dismissal." *Id.* at 289 (emphasis added).

We assess the amount in controversy as of "the time that the complaint was filed," *Auto-Owners*, 835 F.3d at 395 (citation omitted), such that the subsequent dismissal or defeat of a plaintiff's claims does not retroactively divest the court of jurisdiction, *see id.* at 395–96 ("Subsequent events cannot reduce the amount in controversy so as to deprive the district court of jurisdiction, nor can later events increase the amount in controversy and give rise to jurisdiction that did not properly exist at the time of the complaint's filing."). If during the course of pretrial proceedings, however, facts come to light making it apparent that the threshold amount of damages simply was never available as a matter of law, that discovery may be deemed a "revelation" of facts as they existed at the time of filing. *Huber v. Taylor*, 532 F.3d 237, 244 (3d Cir. 2008) (discussing and applying *St. Paul Mercury Indem.*, 303 U.S. at 290). Such a revelation may serve as the basis for finding that the amount in controversy is—and always was—insufficient. *Id.* ("Dismissal is warranted . . . only when a subsequent revelation clearly establishes that the plaintiff's claims never could have amounted to the sum necessary to support diversity jurisdiction."); *see also id.* ("The Supreme Court has endorsed the practice of dismissing a case on the basis of post-filing *revelations* regarding the invalidity of claims at the time of filing[.]" (citing *St. Paul Mercury Indem.*, 303 U.S. at 290)).

In attempting to separate facts in existence at the time of filing and later revelations about those facts (all of which we properly may consider) from subsequent events (information we may not consider), few clear dividing lines exist. At a minimum,

13

however, a plaintiff's subsequently revealed and detailed descriptions of her own alleged injuries as they existed at the time of filing are revelations of past facts rather than subsequent developments. In contrast, a plaintiff's ultimate failure to succeed on a claim or a district court's exclusion of a plaintiff's expert witnesses are subsequent developments not affecting the jurisdictional analysis. *See id*. at 246–47.[1]

For example, in *Huber*, a district court dismissed a civil action on jurisdictional grounds, finding a diversity complaint patently deficient as to the amount in controversy. 532 F.3d at 243. This court reversed, noting that the district court erroneously looked at the case as it "currently exist[ed]" rather than at the time of filing. *Id.* at 246–47. There, the district court noted "that Plaintiffs had failed to present evidence of actual damages, that Plaintiffs' breach of fiduciary duty claims were the only claims that remained viable, and that relief was limited to disgorgement of fees, compensatory damages that were likely to be *de minimis*, and punitive damages." *Id.* at 246. This court characterized those plaintiffs' failures as subsequent events not material to the jurisdictional analysis. *Id.* Further, the potential for punitive damages made it legally uncertain whether the amount in controversy could be met. *Id.* at 246–47. Because it could not be said with

---

[1] The district court in the present case noted that one related case raising similar claims went to trial and resulted in a compensatory award for the plaintiff in the amount of $500. To the extent the district court relied upon this award as evidence to assess the likely value of the current plaintiffs' claims, such reliance was in error. Setting aside any differences between plaintiffs and their alleged personal injuries, the damages assessed by a jury in a different case long after the complaints were filed in the present cases constitutes a subsequent event not material to the jurisdictional issue in the present cases.

legal certainty that damages would be below $75,000, dismissal for lack of jurisdiction was improper. *Id.* at 247.

Against this backdrop, we note that, at the pleading stage, a plaintiff need not set forth with great specificity all the details of her injuries. *Thomas v. Indep. Twp.*, 463 F.3d 285, 295 (3d Cir. 2006) ("As the Supreme Court has advised, the Federal Rules do not require a claimant to set out in detail the facts upon which he bases his claim. Rather, the complaint must only give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." (citations and internal quotation marks omitted)). The notice pleading standard, however, does not relieve the plaintiff of the burden of establishing jurisdiction. As such, a plaintiff's later "fleshing out" of her claims through clarification of her allegations will, necessarily, inform the court as to the potential amount in controversy. Minor injuries meriting possible compensation legally certain to be below the jurisdictional threshold cannot serve as a basis for diversity jurisdiction merely because a plaintiff elects at the pleading stage to omit details that might reveal the true and limited scope of those injuries. Therefore, when a plaintiff clarifies her allegations of injury throughout the pretrial process, the court should ensure such revelations do not show that the jurisdictional amount had always been unavailable.

Here, Alice Breeman alleged four essentially identical counts (one for herself and one "as parent and natural guardian" for each of her three children). In each of these counts, she alleged physical injury, loss and impairment of earning power, ongoing

medical monitoring, and psychological and emotional injury related to a fear of increased cancer risk. She also alleged a count for punitive damages and a count for nuisance.[2] In her demand for relief, she specifically sought "upon each of the foregoing Counts compensatory damages for a sum in excess of One Hundred Fifty Thousand Dollars ($150,000) and punitive damages for a sum not less than Ten Million dollars ($10,000,000.00)."

In subsequent briefing and arguments, however, she clarified the nature and full extent of her and her children's alleged injuries. She sought no medical care at all for her two older children. As to her youngest child, she alleged that the child developed "an aggressive cough" that persisted. (Breeman Appellants' Br. 8) She sought medical care for herself and her youngest child at two emergency room visits one day and three days after her exposure. She sought care for herself at a visit to her regular doctor nine days later. She reported nausea, coughing, headaches, dizziness, and difficulty sleeping. She alleges that she and her youngest child have received conservative treatment, and she alleges minor symptoms that persist. When pressed by the district court, Breeman did not attempt to meaningfully quantify or describe her alleged injuries apart from her physical injuries. She appeared to waive any argument as to the value of her claims for emotional distress related to an increased fear of cancer because she did not ascribe a value, nor

---

[2] The nuisance count alleged interference with enjoyment of property but did not identify the property at issue. Further, in presenting arguments as to subject matter jurisdiction, Breeman does not reference the nuisance claim.

explain in any detail, her claim of emotional distress. Further, she revealed that her request for ongoing medical monitoring was limited to general lifestyle coaching in the nature of diet and exercise recommendations to minimize cancer risks. In fact, in her briefing to our Court, she described her requested monitoring, as set out in detail by her own expert witness, as "preventive measures to promote health by educating Breeman on her exposure and how she can reduce modifiable risk factors to compensate for her increased cancer risk." (Reply Brief at 16) In this regard, counsel for Breeman conceded that she alleged no specific medical testing or early detection methods likely to identify the type of cancer she alleged might arise.

Even assuming for the sake of our analysis that Breeman did not waive arguments concerning possible compensation for emotional damages due to fear of cancer, her claims in this regard cannot push her potential recovery over the amount-in-controversy threshold. Such claims under New Jersey law are compensable in two circumstances. First, an emotional-distress claim may be viable where a plaintiff demonstrates a physical injury as a result of chemical exposure and also demonstrates the reasonableness of an attendant fear of an increased cancer risk. *Theer v. Philip Carey Co.*, 611 A.2d 148, 153 (N.J. Super. Ct. App. Div. 1992), *rev'd on other grounds*, 628 A.2d. 724 (N.J. 1993); *Ironbound Health Rights Advisory Comm'n v. Diamond Shamrock Chems. Co.*, 578 A.2d 1248, 1250 (N.J. Super. Ct. App. Div. 1990) ("A person who sustains physical injury because of exposure to toxic chemicals may recover damages for emotional distress

17

based on a reasonable concern that he or she has an enhanced risk of future disease."). Second, in the absence of a physical injury, an emotional distress claim may be viable "where the resultant emotional distress is severe, substantial and tantamount to physical injury." *Theer*, 611 A.2d at 153. Here, as revealed through Breeman's own expert witness who relied on Breeman's allegations regarding the concentration of chemical exposure, Breeman alleges an increased likelihood of contracting cancer in the range of 1 in 10,000. She did not allege emotional distress of a severe nature as anticipated in *Theer*.

Based on these more detailed representations about the general injuries the Breemans alleged in the complaint, we conclude to a legal certainty that possible compensatory damages, in the absence of punitive damages, cannot reach the jurisdictional threshold. We do not mean to characterize the alleged injuries as *de minimis*. In assessing the amount in controversy, however, including the reasonableness of a fear of an increased cancer risk and the compensable scale of that risk, we must apply a common sense filter to the plaintiffs' own allegations of harm. An award that would amount to an impermissibly excessive verdict cannot be the measuring stick in a jurisdictional analysis. *See Nelson v. Keefer*, 451 F.2d 289, 295 (3d Cir. 1971) (stating, in the context of an amount-in-controversy analysis, "This court has succinctly and frequently stated that the question of excessiveness of a verdict is primarily a matter to be

18

addressed to the sound discretion of the trial court." (quoting *Russell v. Monongahela Ry. Co.*, 262 F.2d 349, 352 (3d Cir. 1958))).

Similarly, first-responder plaintiffs Ragone and Everingham alleged minor symptoms describing physical injuries compensable, if at all, at some amount far below the $75,000 jurisdictional threshold. Although it is difficult to see how the first-responder plaintiffs can justify an award of damages above this amount, we take their demands for relief and arguments in the most favorable and generous possible light. Doing so, we interpret their demands as seeking compensation for ongoing medical monitoring and emotional distress for cancer fears. Like the Breemans, these plaintiffs indicate in no fashion how such demands in the present case might push possible compensatory damages over the jurisdictional threshold.

The plaintiffs' claims, however, are not limited to compensatory damages; they also seek punitive damages. "If appropriately made . . . claims for punitive damages 'will generally satisfy the amount in controversy requirement because it cannot be stated to a legal certainty that the value of the plaintiff's claim is below the statutory minimum.'" *Huber*, 532 F.3d at 244 (quoting *Golden ex rel. Golden v. Golden*, 382 F.3d 348, 355 (3d Cir. 2004) (emphasis omitted)). This follows from the fact that, although punitive damages greater than single-digit multiples of actual damages are rare, higher multiples may be justified if actual damages are small and the offending conduct is particularly egregious. *See, e.g.*, *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d

19

224, 234 (3d Cir. 2005) ("While few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process, greater ratios may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." (internal quotation marks and citations omitted)). As such, because a court generally cannot assess with the requisite legal certainty what punitive damages a jury might award, a good-faith and colorable claim for punitive damages tends to open the door for diversity jurisdiction even where alleged compensatory damages, standing alone, cannot reach the jurisdictional threshold. *See Huber*, 532 F.3d at 244, 246.

A claim for punitive damages, however, is not a mere abstraction. A generalized allegation of a naked legal conclusion that someone acted "willfully" or "maliciously" cannot convert what otherwise is a state-court negligence suit into a federal diversity action for punitive damages. Rather, a pleading as to punitive damages must be viewed against the backdrop of the governing law regarding the availability of punitive damages. In this case, New Jersey law applies. Through express statutory language, New Jersey provides that even gross negligence will not suffice to make punitive damages available.[3]

---

[3] New Jersey Stat. Ann. § 2A:15-5.12 provides:

> Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

20

Conduct must occur with malice or "with knowledge of a high degree of probability of harm and reckless indifference to the consequences." *Smith v. Whitaker*, 734 A.2d 243, 254 (N.J. 1999).

Breeman alleged many failures by Conrail or its employees that, if true, would appear to constitute negligence or even gross negligence. Her allegations, however, did not show intentional, malicious conduct, nor did her allegations set forth acts or omissions undertaken "with knowledge of a high degree of probability of harm." *Id.* She alleged Conrail received many reports of problems with the bridge's signal system in 2012 with an uptick in reports after Hurricane Sandy. She also alleged that prior to relying on the signal system, Conrail employed a human to move the bridge and ensure locked rails. She acknowledged, however, that Conrail personnel inspected the rails and locks as a human backstop to the automatic signal system. She also acknowledged the conductor, in fact, inspected the locks on the day of the derailment prior to the train's attempted crossing of Mantua Creek, as had been done by many other trains that crossed the bridge following signal failures and human inspections.

This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.

The first-responder plaintiffs asked for punitive damages in their complaints as to claims alleging "gross negligence." Everingham also asked for punitive damages as to a claim alleging "strict liability." Punitive damages are unavailable as to these plaintiffs for the reasons discussed *infra* in reference to Breeman's arguments. Punitive damages also are unavailable due to the statutory restriction on such damages for claims asserting gross negligence.

Against this backdrop, she alleges the following as wrongful acts: permitting an inadequately trained person to make the decision to proceed over the bridge despite the red signal; failing to comply with operating rules; failure to properly inspect, maintain, and repair the signal system; failure to take necessary precautions despite engaging in an ultra-hazardous activity; and failure to warn people in the area of the risks at the bridge.

These allegations simply do not satisfy New Jersey's rigorous test to open the door for punitive damages. In general, Breeman alleges Conrail knew there was a problem with the locking and signal system and did not do enough—did not take sufficient action—to resolve the problem or take the bridge out of service. Breeman's allegations, therefore, are in the nature of claims for negligence or gross negligence. To the extent she identifies facts and risks of which personnel at Conrail knew or should have known, she does not identify a willful flaunting of those risks. Rather, she alleges inadequate steps to remedy or guard against those risks.

Punitive damages are unavailable in a situation like this, where a defendant knows of a potentially hazardous situation and unsuccessfully takes steps to remedy the situation. In *Allendorf v. Kaiserman Enterprises*, an elevator doors' safety features were malfunctioning, and the defendant had acted in an effort to inspect and remedy the malfunction before an accident occurred. 630 A.2d 402, 404 (N.J. Super. Ct. App. Div. 1993). The morning of the accident in that case, a technician inspected the elevator but did not find or fix the problem. *Id.* The court held that punitive damages were

22

unavailable. Id. at 409. The court observed that "[the defendant] did not simply ignore the problems with the elevator but instead called [the technicians] to service it." Id. Ultimately, the court concluded that "this evidence would not support a finding that [the defendant] intended someone to be injured in its elevator or that it was aware there was a high probability of injury." *Id.* Like the defendant in *Allendorf*, Conrail acted to address a risk. Continued use of the bridge with in-person inspection rather than reliance upon the signal system cannot demonstrate the requisite scienter for punitive damages. Similarly, to the extent Breeman focuses upon the conductor's training, skills, and qualifications, or the engineer or dispatcher's failure to inquire as to the conductor's qualifications, her claims, again, amount to claims of negligence.

Because we conclude punitive damages are unavailable and compensatory damages do not pass the jurisdictional threshold, federal diversity jurisdiction is lacking as to the Breemans, Everingham, and Ragone. We will accordingly dismiss these appellants' cases without prejudice.